## STATE v. FRANK C. GAMELGARD.

177 N. W. (2d) 404.

May 1, 1970—No. 41564.

*James Malcolm Williams,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Sheran, Peterson, Frank T. Gallagher, and Theodore B. Knudson, JJ.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from a judgment of the district court adjudging defendant, Frank C. Gamelgard, guilty on two indictments for theft.

In 1959 Thomas Dwyer graduated from college and began working as a claims adjuster for Employers Mutual Insurance Company of Wausau in its Minneapolis office. In 1961 he was promoted to claims examiner, which is a supervisory post over a number of adjusters. When a claim by or against a policyholder of Mutual is received, an adjuster investigates and has authority to decide whether or not the claim should be paid and in what amount. The examiner checks the adjuster's determination and if he agrees, authorizes that it be paid and makes out the check.

In 1963 Dwyer began to defraud the company, initially by making fraudulent claims on a very small scale so that no one would bother to check up on him. This continued until 1965. In that year Dwyer developed a scheme or plan to obtain larger amounts. He enlisted the aid of defendant, who was in the auto repair business in Minneapolis and had done much repair work for Employers Mutual. Dwyer's plan was that defendant would work up a repair estimate on a nonexistent car. Dwyer would then make the estimate a part of the claim of a real accident. He would authorize a check to pay defendant for the repair work on the nonexistent car. Defendant would cash the check and they would split the cash.

The plan was carried out a number of times, the amount of each check usually being about $800. Then Dwyer decided that because defendant was well known around town, Dwyer would step up the operation by making fraudulent claims in the names of nonexistent persons. Then he or defendant would endorse the check in the name of the nonexistent payee and defendant would take the check to a bank where he was known, endorse it, and split the cash with Dwyer.

Both of these schemes were in operation from late 1965 until March 1967. Dwyer stated that in all he stole $30,000 and that $23,000 of that amount was taken with defendant as an accomplice.

In April 1967 Dwyer was fired by the insurance company and an investigation was started. Dwyer went to California but returned whenever requested to do so by the county attorney. He was indicted by a Hennepin County grand jury on October 31, 1967, on two indictments, comparable to the ones in the instant case, pled guilty, and was sentenced to a 10-year indeterminate sentence and immediately placed on probation. This was done on the first day of defendant's trial.

Defendant was indicted by a grand jury in Hennepin County on November 14, 1967. He was charged with aiding and abetting (Minn. St. 609.05, subd. 1) a clerk or agent (§ 628.27) in the crime of theft (§ 609.52, subd. 2[3]). There were two indictments—one, a multiple-check indictment aggregating 9 different checks, totaling over $2,500, which had been cashed within one 6-month period, and the other, a single-check indictment based on a check of more than $100 but less than $2,500. Gamelgard pleaded not guilty to both charges. He was tried in district court in Hennepin County by a jury and before a different judge than the one who had accepted Dwyer's plea of guilty.

The prosecution proved that Dwyer had the opportunity to make fraudulent claims and the authority to issue checks for payment of claims; that many such fraudulent claims were made; and that defendant cashed these checks given in payment of these claims. Dwyer testified that he and defendant acted together with knowledge that the claims were fraudulent; that he obtained the checks; and that defendant cashed them.

The only witnesses for the defense were representatives from banks in and around Minneapolis where defendant cashed the checks involved. They testified on cross-examination that in their opinion he was a respected businessman in Minneapolis.

The jury found defendant guilty on both indictments. While

the judge was cognizant of the fact that Dwyer had previously received a 10-year indeterminate sentence and had been placed on probation, he sentenced defendant to 5 years on each of the two indictments, to run consecutively, totaling a maximum of 10 years in prison.

Thus, we have a situation where, according to defendant's claim, Dwyer, the principal perpetrator of the crimes, was immediately placed on probation by a judge of the same district court in which defendant was tried, whereas defendant was sentenced to 10 years' imprisonment by another judge in the same court for his involvement in the crimes with Dwyer.

Defendant raises the following legal issues on appeal:

(1) Does the equal protection clause of the United States Constitution require the use of reasonable standards by trial judges in imposing differential sentences on persons convicted of the same crime?

(2) Do the claimed irregularities in the proceedings—the conduct of the prosecuting attorneys and errors of law in the conduct of the trial—when viewed as a whole constitute a denial of defendant's right to due process and a fair and speedy trial?

■ Defendant's contention that he was denied equal protection of the law in contravention of U. S. Const. Amend. XIV is based on the fact that Dwyer, the principal perpetrator, was given probation and allowed to leave this state and reside in California, whereas defendant, the aider and abettor, was given the maximum sentences and no probation. Neither had a prior criminal record, although Dwyer had been arrested as a juvenile.

Dwyer stated on cross-examination that he was acquainted with the county attorney of Hennepin County and that Dwyer had been appointed as one of the investigators of certain dealings involving some state legislators and the State Capitol Credit Union. Defendant claims that Dwyer's political connections are responsible for the more lenient treatment accorded him.

This court does not have the authority to reevaluate the sen-

tence imposed on a defendant. State ex rel. Miletich v. Tahash, 275 Minn. 505, 148 N. W. (2d) 134. If the sentence is authorized by law, we cannot limit or amend it. State v. Bohall, 280 Minn. 1, 157 N. W. (2d) 845. We have recognized that there may be situations where the actions of the prosecutor and court with respect to sentencing may be held to deny defendant's right to equal protection of the laws. State v. Andrews, 282 Minn. 386, 165 N. W. (2d) 528. In Andrews the discretionary action of the prosecutor in engaging in plea bargaining with one defendant and not the other was challenged. Andrews and Schwarting together committed a burglary. Both were charged by information with the crime of first-degree burglary. Schwarting and the prosecutor reached an agreement whereby the charge was reduced to third-degree burglary, and Schwarting was tried, convicted, and sentenced to 5 years, the maximum sentence. Andrews did not engage in plea bargaining. He was tried and convicted of first-degree burglary and sentenced to 20 years, the maximum sentence. It was held that this was not a violation of the equal protection clause where there was no showing that the prosecutor would not have made the same offer to defendant as he did to his accomplice if defendant had been willing to cooperate and where there was no showing it was an intentional or purposeful discrimination. The court recognized that there are numerous and various factors which enter into the determination of culpability and sentence, such as degree of culpability, prior record, and degree of cooperation with the prosecutor and correctional authorities.

In the case before us the challenged action involves sentences imposed by two different judges in the same court. The trial judge has great discretion in the imposition of a sentence. The mere fact that two different judges chose to exercise this discretion in two widely different ways is not in and of itself a denial of equal protection. The factors mentioned in Andrews which determine how severe a sentence will be imposed are such that an appellate court cannot substitute its judgment for that of the

trial court, especially where, as here, two different judges imposed the different sentences.

If the same judge had accepted Dwyer's guilty plea and given him probation and then after a jury trial had sentenced defendant to the consecutive 5-year terms, defendant's argument that he was subject to purposeful discrimination might have some merit. But where Dwyer was sentenced by one judge and defendant by another, defendant must point to more than the difference in sentence treatment before he can establish a denial of equal protection of the law.

In that connection it must be conceded that in a situation, as here, where Dwyer and defendant participated jointly in theft by fraud, the disparity between the 10-year sentence and probation given Dwyer and the consecutive sentences of 5 years on each of two convictions given defendant appears so great as to invite corrective action. However, it is not within our power to reevaluate or reduce sentences. Under our present law, disparity of sentences can occur even though all persons concerned in the sentencing process act conscientiously and with the best of motives. The judges who sentenced Dwyer and defendant are jurists of experience and ability. The sentence to be imposed initially in a criminal case rests in the sound discretion of the trial judge. We recognize that there can be legitimate differences of opinion between trial judges as to whether a person convicted of a criminal offense should or should not be given a probationary sentence. To one judge, the imposition of sentences to be served in prison and consecutively in a given case may seem harsh; to another it may appear that the seriousness of an offense committed by the criminal against society demands a severe penalty. There are no fixed standards in this state which can be applied to determine which of these opposite viewpoints is more nearly right. Conceding the marked and unusual disparity between the sentence imposed on Dwyer and the ones imposed on defendant, it is as much possible that Dwyer was treated too leniently as it is that defendant was treated too harshly.

Moreover, the contrast in the sentences is not quite so acute as it may appear on the surface. Dwyer did receive a 10-year sentence but was placed on probation. He is still subject to the court's power to revoke this suspension for failure to comply with the terms of the probation. If he violates those terms, he can be committed to prison to serve out his sentence. On the other hand, a person sentenced to confinement for a fixed term, as defendant here, may in due time apply to the Adult Corrections Commission for a parole, subject to supervision. If he does, the Adult Corrections Commission is entitled to and may consider any disparity between the sentences of two persons involved equally in the commission of a criminal offense.

We realize that these considerations do not fully answer the problems which arise when persons who commit the same offense are given sentences as apparently unequal as those here involved. Although each judge in his respective jurisdiction has the right to impose a sentence which in his discretion appears fair and reasonable, it seems to us that some procedure should be evolved so that sentences imposed in criminal cases could be reviewed on a state-wide basis and that the agency or institution given power for such review should be charged with the duty of developing and applying state-wide standards which will serve to make the imposition of sentences in criminal cases reasonably uniform. As the law now stands, this court under our past decisions does not have, and cannot assume, this responsibility. We are not prepared at this time to hold that the appellate jurisdiction afforded to this court in all cases by our constitution embraces appellate review of sentences. We do, however, recommend the problem illustrated by this case to the legislature for its consideration in light of widely expressed views that sentences in serious criminal cases should be subject to review by appeal. See, A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences (Approved Draft 1968), and cases cited.

■ Defendant's second argument is that the record as a whole

establishes a denial of due process of law. We have reviewed the record in its entirety and find that defendant was given a fair trial. The issues in the trial court were strenuously contested and defendant was given every opportunity to bring forth any facts in his favor and to raise every legal defense.

One of the most contested issues was the use of the multiple-check indictment to aggregate the amount of the checks. Defendant contends the prosecution failed to establish beyond a reasonable doubt that all of the checks listed in the multiple-check indictment were fraudulent. The trial judge also doubted whether it was permissible in any event to so aggregate checks in this instance and therefore decided to treat the guilty verdict on the multiple-check indictment as a finding of guilty of theft of over $100 and less than $2,500. Defendant's other contention, that the single-check indictment should have been included in the multiple-check indictment under the single course of conduct statute (Minn. St. 609.035), is without merit and the trial court correctly ruled against defendant. See, State v. Moller, 276 Minn. 185, 149 N. W. (2d) 274; State v. Reiland, 274 Minn. 121, 142 N. W. (2d) 635. A single course of conduct under the statute is one behavioral incident, and the theft of different checks at different times is not such a single behavioral incident.

The evidence establishes that defendant knew that Dwyer illegally obtained the checks. The checks were made out to nonexistent persons or to defendant for nonexistent repairs on nonexistent cars. The only conclusion that can be drawn is that defendant knew that neither Dwyer nor defendant was entitled to cash these checks. We have considered other matters raised by defendant in his second issue and find no reversible error.

We, therefore, must conclude that defendant was properly convicted and sentenced.

■ The state moves to strike appellant's brief or, in the alternative, to strike certain pages and passages thereof on the ground that the brief contains unfounded, irrelevant, disrespectful, unprofessional, and insulting allegations. The portions of

the brief which the state finds offensive are: (1) The entire page 5; (2) page 6, lines 3 and 4; (3) page 9, line 17 to end; (4) page 10, paragraph B; (5) page 10, paragraph E; (6) page 11, paragraph G; (7) page 11, paragraph H; (8) counsel's affidavit, appendix 17. The gist of each of these pages and passages is that the county attorney, either alone or in conjunction with the trial court, gave Dwyer special treatment because of his political connections and treated defendant harshly because he had no such connections.

The state cites three cases to support its position. State v. Joyce, 250 Minn. 456, 84 N. W. (2d) 893; Sargent v. Bryan, 166 Minn. 45, 207 N. W. 178; State v. Horr, 163 Minn. 141, 203 N. W. 979. It is well established by these cases that when a brief is used as a vehicle for disrespect, insult, and slanderous accusations which find no support in the record or refer to matters entirely outside the record, this court will grant a motion to strike the brief from the files.

Counsel appears to feel that a grave injustice was done his client, but this is no excuse to cast unseemly and unsupported aspersions upon the conduct and motives of the county attorney and trial judge. Unlike the brief in Horr, the one objected to here is not saturated with improper material. Therefore, it can be remedied by striking only the objectionable portions and not the entire brief.

The pages and passages of appellant's brief objected to by respondent are stricken.

Motion has been made by the public defender to tax as against defendant $600 to apply on the cost of printing the trial transcript. Since we are not satisfied that the defendant is financially able to make the partial payment requested, the application is denied without prejudice to any proceeding that the public defender may consider appropriate in the district court.

Affirmed.