STATE of Minnesota, Respondent,

v.

Jens OLSEN, Appellant.

No. 46146.

Supreme Court of Minnesota.

Oct. 7, 1977.

C. Paul Jones, Public Defender, Ronald L. Haskvitz, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, David W. Larson and Phebe S. Haugen, Asst. County Attys., Minneapolis, for respondent.

Heard before TODD, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

YETKA, Justice.

Appellant and a codefendant were convicted of aggravated arson and conspiracy to commit arson following a jury trial in district court. Following the denial of appellant's motion for judgment notwithstanding the verdict or a new trial, appellant received an indeterminate sentence not to exceed 15 years. After notice of appeal to this court was filed, the case was remanded for postconviction proceedings. The district court denied appellant's petition for postconviction relief. Appellant appeals from the district court's order denying his petition. We reverse and remand for a new trial.

This appeal presents these issues:

(1) Whether the evidence was sufficient to sustain the verdict.

(2) Whether appellant was denied due process because of statements by the trial court in the instructions to the jury.

(3) Whether the post-trial equivocation of the testimony given by the principal witness for the state constituted recantation sufficient to warrant a new trial.

(4) Whether appellant was denied a fair trial and effective representation by counsel because of the joint trial with his codefendant and the dual representation by appellant's counsel.

On July 8, 1974, Gerald S. Johnson died while attempting to set fire to the home of Rudy Kassube, appellant's codefendant. At trial, it was the theory of the prosecution that Kassube, the owner of the house, had offered appellant and Johnson $500 each to set the fire so that he could collect the insurance money, and that Johnson died when an explosion occurred before he could exit the building.

At about 9 p. m. on the night of the fire, Johnson called appellant, whom he had known for approximately 5 years, and asked if appellant would drive him to downtown Minneapolis where he had arranged to obtain a borrowed car. Appellant picked up Johnson around 9:15 or 9:30 p. m. and drove him to Irv's Bar located at the intersection of Broadway and 2nd Street in Minneapolis. The bartender testified that Johnson and appellant stayed at the bar only 10 minutes, and that Johnson asked him and other patrons where he could find a gas station that would be open at that time of night. The bouncer working in the bar that evening, who also worked as a truck driver, testified that Johnson asked him if he could get 5 gallons of fuel oil so that Johnson could "fix somebody's wagon." The bouncer further testified, however, that appellant was not present during the conversation. The bartender also testified that he overheard appellant telling Johnson something to the effect that "I don't want to get involved or leave me out of it," and also something with respect to the car to the effect that appellant could drop Johnson off or that Johnson could use appellant's car.

Appellant's testimony of his activities for the remainder of that evening was that he took Johnson to another bar where the car Johnson had arranged to borrow was located, dropped him off, and then went home.

Johnson was killed later that night in a fire at Kassube's home. Apparently, he had been pouring a flammable liquid around the unoccupied first floor of the two-story dwelling when the vapors from the liquid were ignited by the pilot light of a gas stove causing an explosion and the resultant fire.

At the trial, the prosecution relied on two items of evidence in addition to the conversation in the bar to convict appellant. The first was testimony by a fire department arson investigator that he had been unable to find any car keys in the immediate area of Johnson's body or an abandoned vehicle in the neighborhood. The prosecution contended that this established the use of an accomplice. The most damaging evidence against appellant was the testimony of Mary Lou Towberman, the sister of Johnson, who appellant claims recanted her testimony after the trial. Ms. Towberman

testified that 6 weeks after the fire appellant visited her home and told her that Kassube had offered to give him and Johnson $500 if they would set fire to Kassube's home, and an additional $500 after Kassube collected the fire insurance; that they then drove to Kassube's house, where appellant carried a gas can to the house, but refused to go inside because he was afraid that the gasoline might explode; and that after the explosion appellant went home. Appellant denied this.

Appellant introduced evidence that Johnson had previously threatened to burn down Kassube's house because of Kassube's failure to pay a gambling debt. Also, Ms. Towberman testified that Johnson was often mad at Kassube, and that they had fought each other at a party in her home shortly before the fire. Appellant also introduced evidence that at the time of the incident he was earning a minimum of $320 per week as a subcontractor in the construction business, owned an automobile reconditioning business, and had no pressing debts at the time. This evidence, the defense contended, indicated that Johnson acted alone out of revenge rather than for profit, and that appellant's financial position made it unlikely that he would take part in such an incident for $500.

The jury found appellant guilty on both the charge of aggravated arson and the charge of conspiracy to commit aggravated arson. Prior to sentencing, a letter was sent to the trial court by Ms. Towberman stating that she was unsure of the accuracy of her testimony regarding the conversation she had with appellant after the fire and requested to withdraw that part of her testimony. A petition for postconviction relief was filed and a hearing held before the trial court judge. The court denied the petition.

■ 1. Appellant's initial argument on appeal is that the evidence is not sufficient to sustain the verdict. On the basis of the evidence introduced at trial, the jury reasonably could have concluded that appellant committed the offenses charged. Admittedly, the testimony of Ms. Towberman was crucial to the conviction. In the absence of her testimony, there is no direct evidence to place appellant at the scene of the fire. On appeal, however, the evidence must be viewed most favorably to the state; it must be assumed that the jury believed the state's witness and disbelieved that testimony which contradicted it. *E. g., State v. Schabert*, 222 Minn. 261, 24 N.W.2d 846 (1946). Taken in this light, the evidence was sufficient.

2. Appellant next asserts that he was denied due process in the court's instructions to the jury. When the jury returned for additional instructions, the following colloquy took place between the trial judge and the jury foreman:

"THE COURT: Members of the jury: The bailiff has handed me three notes, and unless you ask me to do otherwise, I will try to answer them in order the way I received them. Is that the way you want it?

"THE FOREMAN: Yes, sir.

"THE COURT: First question asked is: 'Are we able to charge Conspiracy to Commit Aggravated Arson without charging Aggravated Arson?' I presume that means merely as to the defendant, *Mr. Kassube*?

"THE FOREMAN: Yes, sir.

"THE COURT: Well, let's see, you are the foreman, sir?

"THE FOREMAN: Yes, sir.

"THE COURT: You are who?

"THE FOREMAN: Masters.

"THE COURT: Mr. Masters, by charge do you mean find guilty, is that what you mean?

"THE FOREMAN: Yes, sir.

"THE COURT: Your function is to make a finding of guilty or not guilty, not the charge.

"THE FOREMAN: Yes.

"THE COURT: Do you want to know whether *Mr. Kassube* could be found guilty of Conspiracy to Commit Aggravated Arson without being found guilty of Aggravated Arson? Is that the correct question?

"THE FOREMAN: Yes, Your Honor.

"THE COURT: I have conferred with counsel and we all agree that that is what I charged you and you may do that if you so find. That is your option. That would apply to *both defendants*, as a matter of fact, and to the both charges. Do you feel I have answered that question?

"THE FOREMAN: Yes." (Italics supplied.)

■ Appellant contends the reference by the trial court solely to Kassube, even if inadvertent, prejudiced him and could not be amended by the later correction or the general precautionary instructions[1] given prior to the beginning of the jury deliberations because it implied that it was appropriate for the jury to consider a finding of not guilty only with regard to Kassube. No objection to the remark was made at the time, however. Thus, while the remark may have been unfortunate, the failure of the defense attorney to object to its introduction also prevented full corrective measures from being taken. Under such circumstances, the error must be deemed to have been waived.

■ Appellant also objects to the following statement by the trial court given after the additional instructions:

"THE COURT: As long as I am here, might I inquire, Mr. Masters, do you wish to deliberate to a conclusion this evening or what is your wish? Do you want to go back and talk it over?

"THE FOREMAN: We haven't discussed it.

"THE COURT: Perhaps you would rather go in the jury room and discuss it in private.

"THE FOREMAN: Yes.

"THE COURT: All right.

"THE JURY: Thank you."

Appellant argues that these statements constitute a coercive charge, similar to the so-called "Allen charge" disapproved by this court in *State v. Martin*, 297 Minn. 359, 362, 211 N.W.2d 765, 767 (1973): "You should consider that this case must at some time be decided * * *." The clear import of the court's question in the instant case, however, was to inquire of the jurors whether their deliberations would continue late into the evening. The statement does not infer an attitude that the jury was required to deliberate to a conclusion that evening. This statement does not constitute error.

3. Appellant's third argument is that Ms. Towberman, the state's principal witness, recanted her testimony. The test for determining whether a new trial should be granted because of the purported recantation by a witness of trial testimony was set forth by this court in *Whelan v. State*, 298 Minn. 545, 214 N.W.2d 344 (1974), and recently reaffirmed in *State v. Hill*, Minn., 253 N.W.2d 378 (1977).

"The rule in cases of this sort is that the trial court should grant the defendant a new trial if (a) the defendant has acted with due diligence in seeking a new trial and (b) the court is reasonably convinced that the witness has indeed recanted and that without this witness' perjured testimony at trial the jury might well have reached a different verdict." *Whelan v. State*, 298 Minn. 545, 214 N.W.2d 344 (1974).

In the present case, it must be conceded that appellant acted with due diligence in seeking a new trial.

Approximately 6 months after the trial court's verdict of guilty, Ms. Towberman wrote a one-page letter to the trial judge expressing "uncertainty" about her testimony at trial regarding statements allegedly made by appellant to her during a visit of her home. In this letter she asserted that on the occasion in question appellant had been drinking and did not talk clearly, and

1. The court in its charge to the jury stated: "If in this trial I have said or done anything that suggested to you that I have an opinion concerning the merits or claims of the parties, you will not suffer yourself to be influenced by such suggestion. I have not expressed, nor intended to express which evidence has been or has not been established, or what witnesses have testified correctly or not. If any expression of mine has seemed to indicate an opinion relative to any of these matters, I specifically instruct you to disregard it."

she requested that the court "withdraw" that part of her testimony because she was "unsure and may be wrong." At the postconviction hearing Ms. Towberman testified that she was uncertain about her testimony at the trial and that the statement given to the arson investigators on August 23, 1974, and upon which her trial testimony was based, was not written by her, but was rephrased by the arson investigators.

At this point in the postconviction proceedings, the trial court interrupted her testimony to suggest that she have the advice of counsel. A public defender was appointed. She then objected to all subsequent questions on Fifth Amendment grounds and her objections were upheld on that basis by the trial court.

On appeal, appellant contends that Ms. Towberman recanted her testimony to the extent sufficient to warrant a new trial. The central issue is whether Ms. Towberman's "uncertainty" constituted grounds for a new trial. An important case in this respect is *State v. Klashtorni*, 181 Minn. 203, 232 N.W. 111 (1930). In that case, after the defendant was convicted of robbery, the witness who identified him at trial subsequently executed an affidavit indicating that his identification was uncertain. Although this court denied the defendant's motion for a new trial, we stated:

"* * * This can hardly be classed as newly discovered evidence. It is not a case where a witness has changed his testimony, or where he has become convinced that he made a mistake in the former testimony, but rather a case where * * * the witness has become less certain * * *. *Were this witness the mainstay of the identification or the witness who had the best opportunity to identify defendant there might be more*

basis for a new trial." (Italics supplied.) 181 Minn. 209, 232 N.W. 113.

▉▉▉ There are no overtones of coercion present here. Cf. *State v. Hill, supra*. Ms. Towberman came forward on her own. She was the central witness for the state and the conviction hinged on her testimony at trial. The testimony of Ms. Towberman at the postconviction hearing, if used at trial, could change some minds. However, we do not believe there was sufficient recantation to constitute error and thus a new trial.[2]

▉▉▉ 4. As another ground for error, appellant argues that he was denied a fair trial because of his joint trial with his codefendant. The applicable statute on joint trials at the time of appellant's trial,[3] Minn.St. 631.03, provided:

"When two or more defendants shall be jointly indicted or informed against for a felony, they shall be tried separately provided, however, upon written motion, the court, in the interest of justice and not related to time or economy may order a joint trial for any two or more said defendants. In cases other than felonies, defendants jointly indicted or informed against may be tried jointly or separately, in the discretion of the court. In all cases any one or more of said defendants may be convicted or acquitted."

The clear import of this section is that a separate trial must be provided unless affirmative steps are taken to request the court to order a joint trial in the interests of justice. In the instant case, the state failed to make a written motion for joinder. Moreover, it was not until the second day of trial that the court informed appellant of his rights respecting a separate trial. By the second day of trial it is doubtful that appellant could have been in a position to make a meaningful waiver of such a deficiency. This, also, constituted error.

---

**2.** Ms. Towberman's inability to testify at the postconviction hearing because of the privilege of self-incrimination, however, would constitute "unavailability to testify at trial" sufficient to allow the admission of any declarations against her penal interest. See, e. g., *People v. Brown*, 26 N.Y.2d 88, 308 N.Y.S.2d 825, 257 N.E.2d 16 (1970); Annotation, 43 A.L.R.3d 1413. See, generally, Note, *Declarations*

*Against Penal Interest: Standards of Admissibility Under an Emerging Majority Rule*, 56 B.U.L.Rev. 148. See, also, *State v. Higginbotham*, 298 Minn. 1, 212 N.W.2d 881 (1973); Rule 804(a)(1), (b)(3), Minnesota Rules of Evidence.

**3.** Minn.St. 631.03 was superseded by Rule 17.-03, Subd. 2(1), Rules of Criminal Procedure, which became effective July 1, 1975.

On the basis of the joint-trial procedures, reversal is necessary; however, we feel compelled to comment, once again, on the final issue raised—the joint representation of codefendants by a single attorney—and to announce the adoption of procedures to limit its abuses.

The Sixth Amendment of the U. S. Constitution mandates that the defendant in a criminal prosecution be provided with "effective aid in the preparation and trial of the case," *Powell v. Alabama*, 287 U. S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Accord, *State v. Fields*, 279 Minn. 374, 157 N.W.2d 61 (1968); *State v. Waldron*, 273 Minn. 57, 139 N.W.2d 785 (1966). Effective assistance of counsel contemplates that such assistance be "untrammeled and unimpaired by * * * requiring that one lawyer shall simultaneously represent conflicting interests." *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680, 699 (1942). For this reason the United States Supreme Court has held that the Sixth Amendment right to fair and effective counsel can be abridged when several defendants are represented by one counsel. Ibid.

This court has indicated "strong disapproval of dual representation," *State v. Wilson*, 294 Minn. 501, 200 N.W.2d 185 (1972), and in *State v. Robinson*, 271 Minn. 477, 481, 136 N.W.2d 401, 405, certiorari denied, 382 U.S. 948, 86 S.Ct. 410, 15 L.Ed.2d 356 (1965), we stated that—

"* * * as a caveat we suggest that except in the most extraordinary cases it is better practice routinely to appoint separate counsel for each defendant in a joint trial. The possibility of a conflict in

representation arising out of some unforeseeable circumstance in defending the criminal prosecution can thus be avoided."

The danger of a conflict is so severe in such a situation that the American Bar Association has recommended that such dual representation be undertaken only in the extraordinary case. Thus, A.B.A. Standards for Criminal Justice, The Defense Function, § 3.5(b) (Approved Draft, 1971),[4] states:

"Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation."

The reasons for such a position are clear. The inherent difficulty which faces any attorney who undertakes the joint representation of codefendants is that he or she must simultaneously balance the interests of each defendant against each other. Not only must the attorney of codefendants defend against the prosecution, but he or she must also defend against conflicts between the defendants themselves. As aptly explained by one commentator:

4. The commentary to § 3.5(b) explains that the following dangers arise from multiple-client representation: "* * * In many instances a given course of action may be advantageous to one of the defendants but not necessarily to the other. The prosecutor may be inclined to accept a guilty plea from one of the co-defendants, either to a lesser offense or with a lesser penalty or other considerations; but this might harm the interests of the other defendant. The contrast in the dispositions of their cases may have a harmful impact on the remaining defendant; the one who pleads guilty might even, as part of the plea agreement, consent to testify

against the co-defendant. Moreover, the very fact of multiple representation makes it impossible to assure the accused that his statements to the lawyer are given in full confidence. Defense counsel necessarily must confront each with any conflicting statements made by the other in the course of planning the defense of the cases. In this situation he may find that he must 'judge' his clients to determine which is telling the truth, and his role as advocate would inevitably be undermined as to one if not both defendants." A.B.A. Standards for Criminal Justice, The Defense Function, § 3.5(b) (Approved Draft, 1971).

"The interests and defenses of co-defendants are, as a general rule, antagonistic; and, given the fact of joint representation, a strong likelihood arises that a conflict exists or will ensue. The inherent difficulty in such a situation is that a single attorney must simultaneously steer the defenses of each defendant on proper course thereby wasting much of his valuable courtroom concentration on the task of preventing scrapes and collisions between multi-client interests. He can no longer freely decide what will be most advantageous for the defense of one client without first weighing against it the disadvantages that might consequently accrue to the other. He must, in short, temper his strategy to a middle-of-the-road position. This condition, of course, imposes an artificial and strained approach on a singular counsel which prevents him from developing a full, aggressive defensive strategy. The shattering impact of skilled technique which ordinarily could be leveled in full force against the opposition must be partially, and often substantially, diffused in a constant concern to calculate the possible harm each maneuver might work on the co-defendant. Counsel must pick, choose, compromise and forego various attacks because of the threat of adverse repercussions to the interests of the co-defendant. He is thereby prevented from the use of all the weapons in his legal armory." Note, 23 Ark.L.Rev. 250, 254.[5]

Thus, on occasion the joint representation of codefendants has added to the defense of a criminal charge the additional burden of the possibility of inconsistent pleas,[6] factually inconsistent alibis,[7] conflicts in testimony,[8] differences in degree of involvement in the crime,[9] tactical admission of evidence,[10] the calling and cross-examination and impeachment of witnesses,[11] or strategy in final summation.[12] See, generally, Pirsig & Kirwin, Professional Responsibility (3 ed.) pp. 386 to 389; Annotation, 34 A.L.R.3d 470. In addition, courts have alluded to such intangible factors as the added possibility of guilt by association.[13]

■ We must express again our disapproval of joint representation and again stress the attendant dangers it adds to effective representation by counsel. At the same time, we recognize that the effective representation by counsel, though a constitutional right, may be waived. *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457,

---

5. See, also, Note, 58 Geo.L.J. 369.

6. See, *Commonwealth v. White,* 214 Pa.Super. 264, 252 A.2d 204 (1969) (one codefendant denied all charges while two others pled not guilty to several charges).

7. See, *People v. Bopp,* 279 Ill. 184, 116 N.E. 679 (1917) (one alibi might disprove the other).

8. See, *Sawyer v. Brough,* 358 F.2d 70 (4 Cir. 1966) (one codefendant denied guilt and accused other codefendant of crime). But see, e. g., *State ex. rel. Knott v. Tahash,* 281 Minn. 305, 161 N.W.2d 617 (1968) (both defendants adopted same version of crime without implicating one another); *State v. Robinson,* 271 Minn. 477, 136 N.W.2d 401, certiorari denied, 382 U.S. 948, 86 S.Ct. 410, 15 L.Ed.2d 356 (1965) (both defendants attributed crime to third person).

9. See, *People v. Keesee,* 250 Cal.App.2d 794, 58 Cal.Rptr. 780 (1967) (defense counsel compared strength of case against each defendant). But see, *State ex rel. Knott v. Tahash, supra* (isolated statement by counsel to the effect that involvement of one codefendant was not as extreme or as serious as that of the other codefendant because of the other codefendant's previous record).

10. See, *State v. Tapia,* 75 N.M. 757, 411 P.2d 234 (1966) (statement by codefendant).

11. See, *Lollar v. United States,* 126 App.D.C. 200, 376 F.2d 243 (1967) (summoning of codefendant to testify). See, also, *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (use at a joint trial of a confession made by one of defendants held to violate the confrontation rights of implicated defendant because he could not cross-examine the codefendant not testifying).

12. See, *People v. Keesee, supra* (defense attorney called evidence against one codefendant stronger than against the other codefendant).

13. See, *People v. Prince,* 268 Cal.App.2d 398, 74 Cal.Rptr. 197 (1968) (codefendant acknowledged his prior felony conviction); *People v. Perry,* 242 Cal.App.2d 724, 51 Cal.Rptr. 740 (1966) (general guilt by association).

465, 86 L.Ed. 680, 699; *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Waiver requires the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). That is, valid waivers not only must be voluntary, but also must be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747, 756 (1970). However, as noted by the Court of Appeals for the District of Columbia Circuit in *Campbell v. United States*, 122 App.D.C. 143, 144, 352 F.2d 359, 360 (1965):

> " * * * An individual defendant is rarely sophisticated enough to evaluate the potential conflicts, and when two defendants appear with a single attorney it cannot be determined, absent inquiry by the trial judge, whether the attorney has made such an appraisal or has advised his clients of the risks. * * * We must indulge every reasonable presumption against the waiver of the unimpaired assistance of counsel. *Glasser v. United States* * * *."

Thus, courts are recognizing the desirability of requiring the trial court to act affirmatively to ascertain whether multiple defendants represented by a single counsel are cognizant of the risks of conflicts of interests and whether, in light of those risks, they still wish to maintain their common representation. See, *United States v. Garcia*, 517 F.2d 272, 275 (5th Cir. 1975); *United States ex rel. Hart v. Davenport*, 478 F.2d 203, 211 (3rd Cir. 1973); *United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972); *Lollar v. United States*, 126 App.D.C. 200, 202, 376 F.2d 243, 245 (1967); *Campbell v. United States*, 122 App.D.C. 143, 144, 352 F.2d 359, 360; *Wall v. State*, 214 So.2d 384, 385 (Fla.Dist.Ct.App.1968) ("[I]t would be sound practice for the trial judge to give a *Miranda*-like warning about the possibility that inconsistent defenses, evidence or trial tactics might prejudice defendants jointly represented * * *."). But see, *United States v. Mandell*, 525 F.2d 671, 677 (7 Cir.

1975), certiorari denied, 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976) (primary responsibility must lie with attorney).

■ The most definitive approach has been taken by the Court of Appeals for the Fifth Circuit in *United States v. Garcia, supra*, which, in analogizing a defendant's waiver of his attorney's possible conflict of interest to the procedural requirements attendant to a defendant's plea of guilty, stated:

> " * * * the * * * court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the * * * court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. * * * It is, of course, vital that the waiver be established by 'clear, unequivocal, and unambiguous language.' * * * Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego this significant constitutional protection. Recordation of the waiver colloquy between defendant and judge will also serve the government's interest by assisting in shielding any potential conviction from collateral attack, either on Sixth Amendment grounds or on a Fifth or Fourteenth Amendment 'fundamental fairness' basis."

We believe the adoption of such a procedure in this state would safeguard the rights of defendants under both the Federal and

state [14] constitutions and also serve as a means of promoting effective judicial administration by providing a meaningful and independent basis upon which the trial or appellate court may make an independent assessment of the voluntariness of the waiver of such a right. Therefore, we would require the use of such a procedure for trials commencing after the publication date of this opinion.[15] The defendant must voluntarily and with full knowledge of the consequences decide on dual representation.

The court should address each defendant personally and advise him of the potential danger of dual representation. The defendant should have an opportunity and be at liberty to question the trial court on the nature and consequences of dual representation and the entire procedure should be placed on the record for review.[16] When satisfactory inquiry does not appear on the record, the burden shifts to the state to demonstrate beyond a reasonable doubt that a prejudicial [17] conflict of interests did

14. See, Minn.Const. art. 1, § 6: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the county or district wherein the crime shall have been committed, which county or district shall have been previously ascertained by law. The accused shall enjoy the right to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor and to have the assistance of counsel in his defense."

Although we do not do so here, a state supreme court may interpret the constitution of its own state to afford more protection than the Federal constitution. Cf., e. g., *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1977) (public school finance system based primarily on real property tax violates state constitution) with *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (same scheme does not violate Federal equal protection provision). See, generally, Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489.

15. In general, "the Constitution neither prohibits nor requires retrospective effect," *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601, 608 (1965); however, a balancing formula usually is applied to determine whether a rule is to be retroactive or principally prospective. The criteria for determining retroactivity or prospectivity are: " * * * (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. *Stovall v. Denno,* 388 U.S. 293, 297 [87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1203] (1967)." *Adams v. Illinois,* 405 U.S. 278, 280, 92 S.Ct. 916, 918, 31 L.Ed.2d 202, 206 (1972).

When the probability of how the absence of such a procedure would affect the truth-determining process is weighed against the prior justified reliance upon the old standard and the impact of retroactivity upon the administration of justice, prospective application clearly is preferable.

16. Although the waiver questioning normally would be expected to take place with counsel for both the prosecution and defense present, there may be unusual circumstances where the court, in its discretion, may pursue the inquiry with the defendants and their counsel on the record but in chambers to avoid the possibility of prejudicial disclosures to the prosecution.

17. While this court previously has indicated that "actual prejudice" must be shown, see, e. g., *State v. Robinson,* 271 Minn. 477, 136 N.W.2d 401, certiorari denied, 382 U.S. 948, 86 S.Ct. 410, 15 L.Ed.2d 356 (1965), the nature of the "prejudice" necessary has not been greatly discussed. Some courts have taken a strict view, requiring that there "be evidence of an actual conflict of interest or evidence pointing to a substantial possibility of a conflict of interest before error will be found in appointing one attorney to represent two or more codefendants." *United States v. Valenzuela,* 521 F.2d 414, 416 (8 Cir. 1975). Other courts have taken a different approach and recognized that in some instances the possibility of prejudice is sufficient, because of the fundamental nature of the right involved, stating that the right to the assistance of counsel "is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680, 702 (1942). See, generally, Note, 23 Ark.L.Rev. 250, 256.

We believe the appropriate position is that taken by the Court of Appeals for the District of Columbia in *Lollar v. United States,* 126 App.D.C. 200, 203, 376 F.2d 243, 246 (1967), wherein the court stated:

"We take as our guideline the Supreme Court's admonition in *Glasser* that '[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.' 315 U.S. at 76, 62 S.Ct. at 467. The obvious reason against insisting on a precise delineation of the prejudice suffered is that such a task is made very difficult when one must rely on a cold, printed

not exist. See, *Lollar v. United States,* 126 App.D.C. 200, 376 F.2d 243 (1967).

The trial court is reversed and the case remanded for a new trial.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

record for reconstruction of the manifold and complex dynamics of the trial process, including reasons for trial tactics which may have been dictated by the joint representation. Like the famous tip of the iceberg, the record may not reveal the whole story; apparently minor instances in the record which suggest co-defendants' conflicting interests may well be the telltale signs of deeper conflict. Because of this, and because of the fundamental nature of the right involved, when there are indications in the record that stir doubts about the effectiveness of joint representation, those doubts should be resolved in favor of the defendant * * *.

"We hold, therefore, that only where ' "we can find no basis in the record for an informed speculation" that appellant's rights were prejudicially affected,' can the conviction stand. * * * In effect, we adopt the standard of 'reasonable doubt,' a standard the Supreme Court recently said must govern whenever the prosecution contends the denial of a constitutional right is merely harmless error. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 18 L.Ed.2d 241 (1967)."