STATE of Minnesota, Respondent,

v.

Alan N. EATON, Appellant.

No. 48727.

Supreme Court of Minnesota.

April 11, 1980.

Thomson & Nordby, and Jack S. Nordby, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, David W. Larson and Toni Beitz, Asst. County Attys., and Thomas A. Weist and Janeen E. Rosas, Asst. County Attys., Minneapolis, for respondent.

Heard before KELLY, YETKA and SCOTT, JJ., and considered and decided by the court en banc.

YETKA, Justice.

The joint complaint in this case, filed July 13, 1977, charged defendants Alan N. Eaton and Norvell Shapleigh Stith with 11 counts each.[1] The counts centered around a $12,500 transaction on or about February 6, 1976, and a $30,000 transaction on or about February 9, 1976, and included two counts of theft by swindle, two counts of theft by false representations, and seven counts of fraud and misrepresentation in connection with the sale or purchase of securities.

The defendants elected to be jointly represented by the same attorney. On November 16, 1977, in a special proceeding, the trial judge apprised both defendants of the dangers involved in joint representation "even if there is a separate trial, even though you are not tried together." The judge also made it clear that either defendant could change his mind and get a different attorney, even after once waiving this right. The prosecution also moved for a joint trial at the November 16 appearance, and the trial was set for November 28.

The trial date was changed to December 5, 1977, because of a schedule conflict on the part of defendants' counsel. On November 23, 1977, the trial court granted the joint trial motion. On November 29, 1977, the defendants petitioned this court for a

---

1. See also our opinion in *State v. Stith,* 292 N.W.2d 269 (Minn.1980), issued simultaneously with this opinion.

writ of mandamus to sever the trials. That writ was denied on December 1, 1977.

The omnibus hearing and jury trial in this case actually commenced on December 13, 1977. The jury returned a verdict of guilty on all 11 counts for each defendant. The judge sentenced the defendants on the two counts of theft by swindle only, imposing 0 to 10 years imprisonment and a $10,000 fine on each count, the prison sentences to run consecutively. After the denial of motions for a new trial, for bail pending appeal, and to correct sentences, defendant Eaton brings this appeal. We affirm in part but vacate the two convictions for theft by false representation.

The issues relevant to this appeal are:

1. Was it prejudicial error to order a joint trial, especially where the defendants were represented by the same attorney?

2. Are consecutive sentences on the two counts of theft by swindle impermissible because they doubly punish a single behavioral incident or, in the alternative, are simply excessive?

3. Was defendant Eaton improperly convicted under the theft statutes because his conduct was more specifically covered by the securities fraud provisions of Minn.Stat. §§ 80A.01, 80A.22 (1978)?

4. Was there prejudicial error in allowing the prosecutor to ask certain allegedly improper questions?

5. Although the issue was not raised, does Minn.Stat. § 609.04 (1978) compel the vacation of the two convictions for theft by false representation as offenses necessarily proved by proof of theft by swindle?

An explication of the rather detailed facts of this case must begin with an introduction to the victims. Robert Brantingham is an architect who is interested in restoration work. He is intrigued by concrete grain silos, and he has been interested since 1970 in converting the Burdick Grain elevators at the intersection of Highways 7 and 100 in St. Louis Park into an apartment complex. Brantingham met Gene Bemel, a real estate developer, in June 1975. Bemel agreed to secure financing for the project and thought of modifying the plans to build a hotel-condominium complex.

Bemel was introduced to Alan Eaton in November 1975. Eaton represented himself to be from a family of great wealth. Eaton said that his father, Olyn Eaton, was a past president of the American Medical Association and a founder of Eaton Laboratories. In 1966, according to Eaton, Eaton Laboratories had been sold to Norwich Pharmaceutical for $200 million; this sale had been engineered by the family financial advisor, Dr. Norvell Shapleigh Stith. Eaton currently sold fertilizer worldwide through European American Corporation. Eaton expressed interest in the silo conversion project but said he wanted to consult with Stith.

In late November 1975, there was a meeting among Eaton, Stith, Brantingham and Bemel. Stith represented himself to be an international banker and courier with a doctorate from Purdue. Stith gave Bemel and Brantingham a business card for European American Financial S.A., which Stith said was the trust department of the Banco de Colombia in Panama. Although Eaton's "European American Corporation" and Stith's "European American Financial S.A." are separate entities, the logo on Stith's business card is identical to that on Eaton's card. Stith carried an impressive briefcase with a seal on it from which he produced a financial statement showing Eaton's net worth to be $9 million.

There were numerous other meetings at which the financial concept for the "Grain Towers Inn" was discussed. Many of these meetings were held at Eaton's home at 6609 Biscayne Boulevard in Edina, which Eaton claimed to have purchased with $235,000 cash. Stith proposed that $15 million be raised for the project; if Bemel and Brantingham could raise $3 million locally, the Banco de Columbia at Panama might loan $12 million. Investors' money would go into certificates of deposit to form a collateral trust, and uneasy investors could also have an assignment against Eaton's personal trust account at the Northwestern Bank in Minneapolis. Stith left for Panama al-

legedly to present the proposal to Banco de Colombia and did not return until January 1976.

Before Stith's return, however, Eaton called Bemel and Brantingham to relate that Stith had presented the proposal at Banco and received a commitment. Stith later showed Bemel a commitment letter allegedly from Banco de Colombia. Eaton gave Brantingham a financial statement from Banco de Colombia, which Brantingham made into an informational booklet for potential investors.

Independently from Stith and Eaton, Bemel and Brantingham borrowed $50,000 from Robert Wooters and $50,000 from Gruman Steel. Eaton suggested that the collateral trust in Banco be started with some of this borrowed money. On February 6, 1976, at Bemel's direction, Brantingham transferred $12,500 from the Brantingham Architects account to Eaton's personal account. Eaton gave Bemel a receipt for the $12,500, signed by Stith, which said five shares of stock had been purchased in European American Financial S.A. Bemel also signed an investment management agreement and a post-mortem power of attorney, which Eaton said were necessary documents to give Stith the power to handle the funds.

In response to Eaton's questioning, Bemel told him that $30,000 of the borrowed money remained, and Eaton suggested that it also be deposited in Panama. Brantingham was reluctant to part with the money, but Eaton assured him the money could be retrieved in 22 days. On February 9, 1976, Brantingham gave Bemel a check which Bemel used to purchase a $30,000 cashier's check made out at Eaton's direction to Allen C. Thompson, Jr. Eaton said Thompson was a courier who would deliver the funds to Panama. The check was endorsed by Thompson and deposited in Eaton's trust account.[2] Neither Brantingham nor Bemel received a receipt for the $30,000.

On August 3, 1976, Bemel and Attorney Richard Meshbesher met with Stith and Ea-

ton. When Bemel began to ask for the money back, Eaton insisted that Brantingham be called because it was his money too. When Bemel was joined by Brantingham in requesting the $42,500 back, Eaton and Stith at first said it was tied up in certificates of deposit until March 1977. Later in the meeting, Eaton and Stith promised to return the money the following day from Eaton's personal funds, plus $10,000 to buy all of Brantingham's drawings. None of this money was ever paid by Eaton or Stith. At trial, Stith testified that the money is in the Union Bank of Switzerland in a numbered account, but he produced no statements from that bank to confirm his testimony.

The prosecution provided much evidence that the representations made by Stith and Eaton were false. Thomas J. Eaton testified that his family was affiliated with Eaton Laboratories, but the laboratories had never been sold, and he was not related to Alan N. Eaton. An investigator for Hennepin County testified that he spoke with Olyn Eaton, who identified his son Alan, but explained that he was a pharmacist and had never been president of the American Medical Association. The asking price for Eaton's home was only $150,000, and Eaton was merely renting the home.

Alberto Villageliu, a credit officer at Banco de Colombia at Panama, testified that the bank has no major clients named Eaton or Stith, and no certificates of deposit were ever purchased in the name of Bemel, Brantingham, Eaton, Stith or Grain Towers, Inc. He had never heard of the Grain Towers project; Stith certainly made no presentation concerning it, and the largest loan ever made by the Panama branch was $5 million. However, Stith did buy a "shelf corporation" from the bank called European American Financial S.A. These "shelf corporations" are dormant corporations provided by the bank as a service, in which the boards of directors are Banco employees, thus allowing the true owner of

---

2. This was actually a custodial account which consisted of promissory notes from Allen C. Thompson, Jr., to Eaton.

the corporation to remain anonymous. This shelf corporation is certainly not the bank's trust department, as Banco de Colombia at Panama has no trust department.

According to Thomas J. Eaton, the Eaton family connected with Eaton Laboratories never had a financial advisor named Dr. Norvell Shapleigh Stith. Stith's degree in economics is from the Sussex College of Technology, which sells doctoral degrees for $300.

The defendants admitted that they "puffed" to get people's attention but claimed the $42,500 was merely a personal investment of Bemel's. Eaton admitted on his taped statement to the county attorney's office that the plan was to raise $3 million onshore and $12 million offshore. Stith testified, however, that he never proposed that Banco de Colombia at Panama would provide $12 million if there was a $3 million collateral trust composed of onshore funds.

The prosecution provided many witnesses who testified to hearing the $3 million–$12 million proposals and stories of Eaton's great wealth and Stith's financial acumen. Robert Wooters, an investment counselor, was told that Stith had a doctorate from Purdue and Eaton was heir to the $200 million Eaton Laboratories sale. Dennis Dyrhaug, a pension consultant, was told 80% of the project financing would come from offshore and 20% onshore. Richard Meshbesher, attorney for Grain Towers, Inc. (*i. e.*, Bemel and Brantingham), saw the $9 million Alan Eaton financial statement, heard Stith say he advised in the $200 million Eaton Laboratories sale, and heard the $3 million–$12 million proposal.

■ 1. Appellant first claims that he was prejudiced by being tried jointly with his co-defendant. Separate trials for defendants jointly charged with a felony are the general rule in Minnesota:

When two or more defendants shall be jointly charged with a felony, they shall be tried separately provided, however, upon written motion, the court in the interests of justice and not solely related to economy of time or expense may order a joint trial for any two or more said defendants. * * *

Minn.R.Crim.P. 17.03, subd. 2(1). The comment to the rule further states that

[i]t shall be considered an abuse of discretion for a trial judge to refuse to grant a joinder where the interests of justice so require.

A case in which the interests of justice required joinder was *State v. Strimling*, 265 N.W.2d 423 (Minn.1978). That case involved alleged misappropriations at several nursing home facilities by several defendants. Joinder was held to be appropriate because of the nature and complexity of these "white collar" crimes, the interest of the state in preventing collaboration by hostile witnesses in a second trial, and the lack of any prejudice to the defendants from the joinder.

The trial court in this case similarly found that the alleged "white collar" crimes were complex and that several key witnesses for the state were unlikely to testify more than once. Further, the defendants could not demonstrate any conflict in their defenses which would prejudice them in a joint trial. The trial court accordingly ordered a joint trial, and this court denied a writ of mandamus in which the defendants sought to sever the trials. As in *Strimling*, the trial court in this case properly exercised its discretion in granting the state's motion for joint trials.

Appellant Eaton seeks to establish on appeal that a conflict between himself and Stith in fact existed. Eaton claims that it was Stith who "did the talking" and made all the false representations to Bemel and Brantingham. Since Eaton did not testify at trial, he claims that Stith's trial testimony tended to shift the entire blame to Eaton.

Upon reviewing the record, appellant's arguments appear to have no merit. It was Eaton, not Stith, who actually accepted the $12,500 and $30,000 checks. Both Eaton and Stith made the same false representations to Bemel and Brantingham. Although Eaton did not take the stand, his

defense that the $42,500 was Bemel's personal investment was completely consistent with Stith's testimony.

The appellant contends, however, that the joint trial, combined with the factor of joint representation, made it impossible for him to amplify any alleged inconsistencies. This court has expressed strong disapproval of dual representation for co-defendants who are tried jointly. *State v. Olsen*, 258 N.W.2d 898 (Minn.1977). Accordingly, the court in *Olsen* admonished trial courts to advise co-defendants of the dangers inherent in being represented by the same attorney.

The trial court scrupulously followed the *Olsen* procedures in this case. On November 16, 1977, the trial court advised Stith and Eaton of the problems involved in joint representation. The court specifically stated that conflicts might arise even if they were tried separately. The court also made it clear that the defendants' waivers of the right to separate counsel could be revoked. Eaton waived his right to independent counsel on the record and never revoked that waiver.

Appellant argues, however, that it would have been useless to retain separate counsel on November 16, the date when the prosecution moved for joint trial, for a trial scheduled to begin on November 28. Appellant suggests that the prosecution purposely delayed the motion for joinder until the eve of trial. The defendants were charged in a joint complaint, however, and the proceedings before November 16, 1977, were handled jointly so the motion should not have come as a surprise to appellant. Further, if the interests of justice were served by a joint trial, they would also have been served by a continuance to allow separate counsel adequate preparation time. *See In re T. D. F.*, 258 N.W.2d 774 (Minn. 1977). At no time did appellant request a continuance so separate counsel would have time to prepare even though defense counsel sought and received a continuance due to his own schedule conflict. Under the circumstances of this case, appellant was not prejudiced by the joint trial.

2. Eaton contends that the February 6, 1976, theft of $12,500 and the February 9, 1976, theft of $30,000 are parts of a single behavioral incident and thus punishable only once pursuant to Minn.Stat. § 609.035 (1978):

> Except as provided in section 609.585, if a person's conduct constitutes more than one offense under the laws of this state he may be punished for only one of such offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them. All such offenses may be included in one prosecution which shall be stated in separate counts.

This court has stated the purpose of section 609.035 to be to limit punishment to a single sentence when a single behavioral incident resulted in more than one violation of the criminal statutes. *State v. Johnson*, 273 Minn. 394, 399, 141 N.W.2d 517 (1966). The test of what is a single behavioral incident is whether the segment of conduct involved was motivated by an effort to obtain a single criminal objective. *Id.*, 273 Minn. at 404, 141 N.W.2d 517. In other words, a single behavioral incident is the result of a single motivation directed towards a single criminal goal. *State v. Reiland*, 274 Minn. 121, 142 N.W.2d 635 (1966). The policy of the statute is to protect against exaggerating the criminality of a person's conduct and to make both punishment and prosecution commensurate with culpability. *State ex rel. Stangvik v. Tahash*, 281 Minn. 353, 360, 161 N.W.2d 667 (1968).

Accordingly, Eaton argues that consecutive sentences for the February 6 and 9 thefts exaggerate the criminality of his conduct. In essence, Eaton's argument is that his goals were not to steal $12,500 on February 6 and $30,000 on February 9, but rather that he had a single objective to steal as much as possible from Bemel and Brantingham pursuant to the Grain Towers Inn swindle.

A similar argument was flatly rejected by this court in *State v. Gamelgard*, 287 Minn. 74, 177 N.W.2d 404 (1970). In *Gamelgard*, the defendant and an accomplice de-

vised a scheme whereby the accomplice would submit phony automobile repair bills to defendant, an insurance claims adjuster. The defendant would order payment to the accomplice, and the two would divide the money. The defendant was indicted twice: once in a multiple-check indictment aggregating nine different checks, and once in a single-check indictment. The defendant was convicted on both indictments and sentenced to two consecutive 5-year terms. The court rejected the defendant's argument that the single-check indictment should have been included in the multiple-check indictment, stating:

> A single course of conduct under the statute is one behavioral incident, and the theft of different checks at different times is not such a single behavioral incident.

*Id.*, 287 Minn. at 81, 177 N.W.2d at 409.

■ The thefts in this case were clearly of different checks at different times. The February 6 transaction was for $12,500 and was accomplished by a wire transfer from Brantingham's account to Eaton's account. The February 9 transaction was for $30,000 and was accomplished by Bemel issuing a cashier's check to Eaton made out to Allen C. Thompson, Jr., the supposed courier. As the state points out, Eaton did not know that $30,000 of the borrowed money remained until *after* the February 6 transfer, which indicates that Eaton's intent to steal the $30,000 must have formed after the $12,500 theft.

The evidence does support Eaton's claim that he had one large plan to swindle as much as possible. However, that objective is too broad to be a single criminal goal within the meaning of section 609.035 where, as here, a defendant plans and executes the thefts of two different checks at two separate times.

The second part of Eaton's argument is that the sentence imposed is simply excessive in light of the criminality of his conduct.

■ The general rule in Minnesota, however, is that this court will not re-evaluate a sentence if the trial court's discretion has been properly exercised and the sentence is authorized by law. *Fritz v. State*, 284 N.W.2d 377 (Minn.1979); *State v. Gamelgard*, 287 Minn. 74, 177 N.W.2d 404 (1970). The sentence imposed here was the maximum allowed by law, and it does not appear that the trial court abused its discretion. The presentence investigation revealed that Eaton was involved in numerous confidence schemes in Minnesota and other states.[3]

Although Eaton urges this court to re-evaluate his sentence, the cases on which he relies are generally inapposite. Two cases show a clear abuse of discretion by the trial court. *United States v. Wardlaw*, 576 F.2d 932 (1st Cir. 1978); *Woosley v. United States*, 478 F.2d 139 (8th Cir. 1973). *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973), *cert. denied*, 415 U.S. 938, 983, 94 S.Ct. 1454, 39 L.Ed.2d 495, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974), holds a mandatory life sentence for a particular recidivist to violate the cruel and unusual punishment clause of the Eighth Amendment. There is no claim that Eaton's punishment is so excessive as to constitute cruel and unusual punishment, nor did the trial court abuse its discretion in this case.

■ 3. Eaton argues that, by analogy to *State v. Kalvig*, 296 Minn. 395, 209 N.W.2d 678 (1973), he could be convicted only of securities fraud and not of the more general crime of theft. In *Kalvig*, the court held that where the defendant was an Aid to Families With Dependent Children recipient alleged to have misrepresented her eligibility for welfare and to have received unauthorized public funds, the county attorney had no discretion to prosecute her under the general felony theft statute rather than the more specific welfare fraud statute. The court found that the legislature had indicated a clear and express intention to deal with alleged welfare fraud as a misdemeanor. The policy of Minn.Stat. § 256.83 (1969)

---

**3.** The confidential portion of the presentence investigation has been shown to Eaton, and there is no indication that Eaton contests any information contained in it.

was to protect a mother on AFDC from the stigma of a felony conviction and to keep the family together. However, the court noted that *Kalvig* had little precedential value since the 1971 statute making welfare fraud a misdemeanor had been amended in 1973 to make the activity a crime chargeable under the general theft statute, Minn. Stat. § 609.52. *Id.*, 296 Minn. at 396 n. 1, 209 N.W.2d at 679 n. 1.

A similar legislative statement appears in the securities fraud statutes:

> Nothing in sections 80A.01 to 80A.31 limits the power of the state to punish any person for any conduct which constitutes a crime under any other statute.

Minn.Stat. § 80A.22, subd. 3 (1978). This subdivision clearly expresses the legislative intent to allow a prosecution for theft by swindle even though the state also prosecutes for securities fraud. Since *Kalvig* was based on an inferred legislative intent, Eaton's argument based on that case must fail.

4. Eaton contends that three lines of questioning pursued by the prosecutor on cross-examination of Stith were improper. First, Eaton claims that it was error to allow the prosecutor to ask questions about a conversation Stith had with Sherman Richter, who did not testify at trial. Specifically, the prosecutor asked if Stith ever told Richter about the $3 million–$12 million financial package.

Earlier, Stith had testified that he never proposed that Banco de Colombia would provide $12 million if $3 million were raised as front money. Therefore, the subject of this question was clearly proper, and the only possible impropriety was that Richter did not testify. The court has recently stated that:

> Although it is sometimes stated that a prosecutor commits misconduct if he cross-examines a defense witness about a prior inconsistent statement and then fails to produce extrinsic evidence of that statement, the more correct statement of the rule focuses on whether the prosecutor *is able* to produce extrinsic evidence of the prior statement.

*State v. Stofflet*, 281 N.W.2d 494, 496–97 (Minn.1979). The state in this case has produced a statement by Sherman Richter taken before the trial which demonstrates that the state was able to produce extrinsic evidence of Stith's prior statement. Therefore, there was no error due to the prosecutor's questions concerning Sherman Richter.

The second alleged error is the following question:

> Isn't it true that the Burdick Grain Company lost interest in the Grain Tower project, not because of Bemel and Brantingham, but rather because their attorney Ward Lewis didn't want to get tied up with Eaton?

On direct examination, Stith had testified that Burdick Grain Company was no longer dealing with Bemel and Brantingham. Therefore, this question was within the proper scope of cross-examination. Further, Ward Lewis had testified to increasingly strained dealings with Stith and Eaton, thus providing a factual predicate for the question. The question does not call for a hearsay statement, but rather calls for the reason why Burdick Grain ceased negotiations, a subject about which Stith claimed to have knowledge on direct examination.

Finally, Eaton claims prejudicial error from a question concerning a company Stith was involved with called Kings and Queens Jewelry: "When did that company go under?" Although the form of this question is unduly suggestive, it caused no prejudice to Eaton. Stith admitted that the company no longer sells jewelry. Also, defense counsel objected to the question and it was stricken from the record.

5. Eaton did not raise the issue of how Minn.Stat. § 609.04 (1978) applies to his case. However, the state conceded in its brief in *State v. Stith*, 292 N.W.2d 269 (Minn.1980), which opinion is released simultaneously with this opinion, that theft by false representation was necessarily proven by proof of theft by swindle. Therefore, we must vacate the two convictions of theft by false representation for Eaton as well.

■ Appellant Stith has also raised the argument that the Department of Corrections, in making up a parole matrix for each defendant, considered the 11 separate convictions which resulted in an inordinately long waiting period before parole eligibility. This argument cannot be considered in either the Stith or Eaton case because the Department of Corrections is not a party to either appeal. However, appellant Eaton, as well as Stith, may initiate a state habeas corpus proceeding to challenge the legal adequacy of the procedures followed by the parole authorities. *Kelsey v. State*, 283 N.W.2d 892 (Minn.1979); *State ex rel. Taylor v. Schoen*, 273 N.W.2d 612 (Minn.1978).

The trial court is affirmed, but the two convictions of theft by false representation are vacated.