**STATE of Minnesota, Respondent,**

**v.**

**Anthony SOTO, Petitioner, Appellant.**

**No. C3–95–577.**

Supreme Court of Minnesota.

April 24, 1997.

John M. Stuart, Minnesota State Public Defender, Charlann Winking, Assistant State Public Defender, Minneapolis, for Appellant.

Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

This case challenges the use of the *Hernandez* method in calculating defendant Anthony Soto's criminal history score for the purposes of sentencing him on four separate sales of cocaine to an undercover police officer, which all occurred within the period of approximately one month. We affirm the court of appeals on its determination that the use of the *Hernandez* method was appropriate in this case.

In February 1993, Soto first met an informant and a police officer who were both working undercover at the time. The informant asked Soto about drugs, but Soto replied that he was not involved in the sale of drugs at that time. After this initial conversation, the informant called Soto approximately three times to discuss a purchase of cocaine. Soto testified that although he was not involved in the sale of drugs at the time, he agreed to try to locate some cocaine for the informant because Soto was in bad financial shape.

Soto subsequently agreed to meet the informant and the undercover police officer in a parking lot on February 8, 1993, at which time the officer informed Soto that he had $1,300 for an ounce of cocaine. Soto left the area for five minutes and returned with a bag containing 27 grams of cocaine, which he exchanged with the officer for the money. At that meeting, the officer asked Soto if he could buy 2 or 3 more ounces of cocaine from him at a later time. Soto responded that it would be no problem.

On February 11, 1993, Soto again met with the informant and the undercover police officer in the same parking lot to sell 2 ounces of cocaine for $2,600. Upon meeting, Soto left the area and went into a nearby restaurant. He returned minutes later with 51 grams of cocaine, which he exchanged for the money. Once again, the officer asked Soto at this meeting if he could buy a larger amount later, and Soto again replied that it was no problem.

On February 18, 1993, Soto agreed to meet the informant and undercover police officer at a bar where they waited for the drugs to arrive. At that time, the officer went into the bar to meet Soto and asked to buy an even larger amount of cocaine from Soto in the near future at a reduced price. Soto replied that he knew someone who was bringing cocaine from Mexico which would sell for $1,000 an ounce. When Soto was informed by a woman that the drugs had arrived, he asked the officer to leave and wait in his car. Soto then went out to the car and gave the officer 27 grams of cocaine in exchange for $1,300.

After the February 18 sale, Soto testified that the informant and the undercover police officer called him at least three times a week to arrange a larger sale of cocaine. On March 11, 1993, the officer met Soto and asked to buy 8 ounces of cocaine. The officer agreed to buy 10 ounces for $1,150 per

ounce and they arranged a time to meet later in the day. When the officer arrived at a shopping center to meet with Soto, he was wired with a body microphone and had several officers in the area monitoring him. Soto arrived and gave the officer 279 grams of cocaine in exchange for $11,500. After the exchange was completed, Soto was arrested by the backup officers.

Soto was charged with one count of sale of cocaine in the first degree and the state agreed not to charge him with three additional counts if he would testify against two other accomplices. However, Soto declined the offer and the state amended their complaint by adding the three additional counts for sale of cocaine in the first degree. At trial, Soto asserted the defense of entrapment, but was nevertheless found guilty by the jury of four counts of sale of cocaine in the first degree in violation of Minn.Stat. §§ 152.01, subd. 15(a) (1992), 152.021, subd. 1(1) and 3(a) (1992), and 609.05 (1996).

At sentencing, the state requested a double durational departure, while Soto moved for a downward durational departure. The trial judge rejected both requests and sentenced Soto to the presumptive guidelines sentence for each count, using the *Hernandez* method to calculate his criminal history score. Consequently, Soto was sentenced to 98 months for Count I, based on a level VIII offense and a criminal history score of 1.5 points.[1] The trial judge then assigned two additional criminal history points for Counts II, III, and IV, resulting in concurrent and

presumptive sentences of 122 months, 146 months, and 161 months respectively.[2]

Soto appealed the jury's convictions as well as the sentences imposed. The court of appeals remanded the case for an evidentiary hearing on possible prejudice resulting from the presence of the alternate juror during deliberations. However, the court of appeals did not address the issue of sentencing. On remand, the trial court held an evidentiary hearing and found that no prejudice resulted. In this second appeal, Soto again challenged his sentence and the court of appeals affirmed the sentence.[3]

■■■■■ Soto argues that the trial court's use of the *Hernandez* method to calculate his criminal history score was inappropriate because his multiple convictions involve a single behavioral incident under Minn.Stat. § 609.035.[4] The primary purpose of section 609.035 is to protect a defendant convicted of multiple offenses from unfair exaggeration of the criminality of the conduct and to ensure that punishment is commensurate with culpability. *State v. Hartfield*, 459 N.W.2d 668, 670 (Minn.1990) (citation omitted); *State v. Eaton*, 292 N.W.2d 260, 266 (Minn.1980) (citation omitted). Consequently, the *Hernandez* method cannot be used to increase the criminal history score of a subsequent sentence unless the convictions arose from a different course of conduct under section 609.035. *Hartfield*, 459 N.W.2d at 670; *State v. Banks*, 331 N.W.2d 491, 493 (Minn. 1983).

1. Soto was on probation for fifth-degree possession of marijuana, which is a Level I offense. He thus received one criminal history point for his custody status, and ½ point for the Level I conviction.

2. For Count II, Soto was given two more criminal history points for his first level VIII conviction so that he had a score of 3.5 for the purposes of calculating his sentence for the second offense. Thus, he was sentenced to 122 months for Count II, based on a level VIII offense and a criminal history score of 3.5. For Count III, Soto received two more criminal history points for his second level VIII offense. He was sentenced to 146 months, based on a level VIII offense and a criminal history score of 5.5. Finally, for Count IV, he again received two additional points to his criminal history score to

reflect his third level VIII offense. Soto was sentenced to 161 months for Count IV, based on a level VIII offense and a criminal history score of 7.5.

3. Soto also appealed the trial court's order requiring him to pay restitution to the St. Paul Police Department and the court of appeals reversed the trial court. This issue was not raised on appeal to this court.

4. Minnesota Statutes section 609.035, subdivision 1 provides that "* * * if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them." Minn.Stat. § 609.035, subd. 1 (Supp.1997).

Before we address the arguments in this case, a brief discussion of our decision in *Hernandez* is necessary. Prior to *State v. Hernandez*, 311 N.W.2d 478 (Minn.1981), the Minnesota Sentencing Guidelines allowed prior felony convictions to be used in calculating a defendant's criminal history score only if the sentence had been stayed or imposed before the date of sentencing for the current offense. Minnesota Sentencing Guidelines II.B.1 and cmt. II.B.101 (1980).

In *Hernandez*, this court was confronted with a situation in which the defendant was sentenced on one day for three separate convictions that were not part of a single behavioral incident. 311 N.W.2d at 479. We affirmed the trial court's decision to count the first two convictions of attempted burglary and theft in calculating the criminal history score and sentence for the third conviction for escape. *Id.* at 481. We held that the addition of two points to the defendant's criminal history score before sentencing him for the third conviction was proper, although the first two sentences were not imposed before the date of sentencing for the current offense. *Id.* at 479–81.

This court concluded in *Hernandez* that it was proper for the trial court to count the first two convictions in calculating the defendant's sentence for the third conviction because (1) the three convictions were for separate and distinct offenses that did not involve the same victims, and (2) there was no indication that the trial court was trying to manipulate the Guidelines to achieve a substantive result which the Guidelines did not intend. *Id.* at 481. This court noted that, in the interests of judicial economy, the trial court was merely trying to do what the Guidelines allowed to be done in three or more days.[5] *Id.*

■ Soto challenges the use of the *Hernandez* method to calculate his sentence on several grounds. First, Soto argues that the controlled substance statute under which he was convicted implicitly states that sales of controlled substances within 90 days are presumed to be part of a single course of conduct.[6] However, such an interpretation would lead to the implausible consequence that a person who makes multiple drug sales within 90 days could only be convicted for one count under Minn.Stat. § 152.021, subd. 1. Rather, a more plausible interpretation of Minn.Stat. § 152.021, subd. 1 is that the 90–day period establishes a time frame within which the prosecution may aggregate sales less than 10 grams.

■ Next, Soto argues that because the controlled substance statutes under which he was convicted allegedly presume that the offender is engaged in the ongoing act of selling drugs, this presumption must apply for the purposes of section 609.035. Although the controlled substance statutes may very well punish offenders for their status as a particular kind of dealer,[7] those statutes do

---

**5.** The sentencing guidelines were subsequently amended to reflect this court's decision in *Hernandez*. Section II.B.1 now provides that an offender will receive a criminal history point for each felony conviction which was sentenced "before the current sentencing," Minnesota Sentencing Guidelines II.B.1 (1997), rather than the pre-*Hernandez* language which included convictions "before the date of sentencing for the current offense" in calculating an offender's criminal history score. Minnesota Sentencing Guidelines cmt. II.B.101 (1980).

**6.** Soto was convicted of four counts for violating Minn.Stat. § 152.021, subd. 1(1), which provides that a person is guilty of controlled substance crime in the first degree if "on one or more occasions within a 90–day period the person unlawfully sells one or more mixtures of a total weight of ten grams or more containing cocaine." Minn.Stat. § 152.021, subd. 1(1) (Supp. 1997).

**7.** Soto's contention that the controlled substance statutes punish offenders for their status as a particular kind of dealer is somewhat supported by the legislative history of those statutes. Prior to 1989, controlled substance statutes did not differentiate levels of offenses based on the quantity of drugs involved. *See* Minn.Stat. § 152.09 (1988). In 1989, the legislature restructured the controlled substance statutes so that weight-based classifications applied to all drug offenses. *See* Minn.Stat. § 152.021–25 (1990). Consequently, offenders selling greater quantities were classified under a more severe level than those selling lesser amounts.

Furthermore, the testimony of a witness during legislative hearings suggests that the weight-based classifications were consistent with the amount that various levels of dealers would possess. Hearing on S.F. 3–H.F. 59 before the House Subcomm. on Criminal Justice, 76th Legis.Sess. (Minn. Feb. 24, 1989) (statement of

not presume that the offender is involved in the ongoing business of selling drugs. The legislature has the prerogative to create degrees of punishment for drug crimes based on the quantity of drugs involved. *State v. Clausen*, 493 N.W.2d 113, 118 (Minn.1992). The mere fact that the legislature assigns those degrees of punishment consistent with the quantities that would be sold by various levels of dealers does not mean that the statutes presume that an offender is engaged in multiple drug sales.

■■■ Finally, Soto argues that based on the facts of his case, the drug sales for which he was convicted were all part of a single behavioral act such that section 609.035 prohibits the application of the *Hernandez* method in determining his sentence. Under section 609.035, the factors to be considered in determining whether multiple offenses constitute a single behavioral act are time, place, and whether the offenses were motivated by a desire to obtain a single criminal objective. *Hartfield*, 459 N.W.2d at 670 (citing *State v. Norregaard*, 384 N.W.2d 449 (Minn.1986)); *State v. Hawkins*, 511 N.W.2d 9, 13 (Minn. 1994). The determination of whether multiple offenses are part of a single behavioral act under section 609.035 is not a mechanical test, but involves an examination of all the facts and circumstances. *Banks*, 331 N.W.2d at 493.

A balancing of the above factors and the facts and circumstances of this case weighs in favor of finding that Soto's multiple drug sales constituted separate and distinct offenses under section 609.035. Each of the four sales took place on a different day and at a different place, with the exception that two of the sales occurred in the same parking lot. The separate sales were not motivated by a desire to obtain a single criminal objective. While Soto and other defendants convicted of drug sales may be motivated by the single criminal objective of selling drugs to relieve financial hardship, this court has held that the criminal plan of obtaining as much money as possible is too broad an objective to constitute a single criminal goal within the

meaning of section 609.035. *See Eaton*, 292 N.W.2d at 266–67 (finding that two offenses of theft of a check committed three days apart were separate incidents for the purposes of section 609.035). Consequently, we affirm the determination of the court of appeals that the *Hernandez* method was appropriately used to determine Soto's sentence.

Soto also argues that this court should prohibit application of the *Hernandez* method in calculating his sentence because the use of that method would permit police officers and prosecutors to manipulate investigative or charging procedures so as to achieve a specific sentence. For instance, Soto argues that police officers could manipulate the amount of drugs or the number of sales involved, while prosecutors could separate the drug sales into multiple charges in order to ensure that a higher sentence would be imposed. Soto further argues that permitting police officers and prosecutors to have such discretion creates the potential for racially biased decision-making and perpetuates racial disparities in the prosecution of drug crimes. While application of the *Hernandez* method for convictions resulting from undercover drug operations may very well result in such consequences, we have repeatedly recognized that arguments concerning disparities in sentencing are more appropriately addressed to the Sentencing Guidelines Commission. *State v. Pittel*, 518 N.W.2d 606, 608 (Minn.1994); *State v. Litzinger*, 394 N.W.2d 803, 806 (Minn.1986); *State v. Moore*, 340 N.W.2d 671, 673 (Minn. 1983).

■■■ Aside from challenging the use of the *Hernandez* method in calculating his sentence, Soto urges this court to adopt the doctrines of sentencing entrapment and sentencing manipulation to support a downward departure from his presumptive sentence. Soto argues that both doctrines are necessary because application of the *Hernandez* method in the sentencing of multiple sales of controlled substances to undercover police officers allows those officers to manipulate

James Kamin, Asst. Hennepin County Attorney). Thus, the weight-based cutoff for third-degree sales was consistent with the amount that a

street dealer would sell, whereas the weight-based cutoff for first-degree sales was consistent with what a wholesale dealer would sell. *Id.*

the Sentencing Guidelines by orchestrating the amount of drugs and the number of sales.

Sentencing entrapment occurs when "outrageous official conduct * * * overcomes the will of an individual predisposed only to dealing in small quantities, for the purpose of increasing the amount of drugs * * * and the resulting sentence of the entrapped defendant." *United States v. Barth,* 990 F.2d 422, 424 (8th Cir.1993) (quoting *United States v. Rogers,* 982 F.2d 1241, 1245 (8th Cir.1993). The Eighth Circuit has recognized that the doctrine of sentencing entrapment may be relied upon to depart from the Federal Sentencing Guidelines. *United States v. Stavig,* 80 F.3d 1241, 1245 (8th Cir.1996). The doctrine of sentencing manipulation is a more recent development and was first distinguished from sentencing entrapment in *United States v. Shephard,* 4 F.3d 647, 649 (8th Cir.1993), *cert denied,* 510 U.S. 1203, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994).[8] Sentencing manipulation is outrageous government conduct aimed only at increasing a person's sentence. Whereas sentencing entrapment focuses on the predisposition of the defendant, the related concept of sentencing manipulation is concerned with the conduct and motives of government officials. *Id.*

■ We are concerned with the disparities which result between similarly situated defendants because of varying law enforcement investigative methods or because of differing charging practices. However, we decline to adopt either doctrine in the absence of egregious police conduct which goes beyond legitimate investigative purposes. Even if we were to adopt either doctrine, the trial record of Soto's case does not support a downward departure based on either doctrine. Under the doctrine of sentencing entrapment, Soto would bear the burden of showing that he was predisposed only to sell smaller amounts of cocaine and that he had neither the intent nor the resources for selling the larger amount he was entrapped into selling. *See Stavig,* 80 F.3d at 1246. Although the record shows that Soto was asked to sell an increased amount of cocaine in his last sale to the undercover police officer, the record lacks any evidence that Soto was not predisposed to sell the larger amount. Soto argues that the state failed to produce evidence that he had ever been involved in the sale of cocaine prior to the sales at issue. However, it is the defendant who bears the burden of establishing sentencing entrapment, and not the state. *Id.* at 1245.

■ The record in Soto's case similarly lacks support for a finding of sentencing manipulation. Although recognizing the doctrine of sentencing manipulation, the Eighth Circuit has held that it is reasonable for the police to engage in a chain of transactions with a drug dealer in order to establish that person's guilt or to trace the dealer's supplier. *Shephard,* 4 F.3d at 649 (citations omitted). Because Soto would bear the burden of establishing the presence of sentencing manipulation, his claim must fail because of the absence of any evidence showing that the drug sales were obtained for the sole purpose of increasing his sentence, rather than to establish his guilt or to trace his supplier.

We therefore affirm the court of appeals and hold that it was proper for the trial court to use the *Hernandez* method for the purposes of calculating Soto's sentence. We further decline to adopt the doctrines of sentencing entrapment and sentencing manipulation in the absence of egregious police conduct which goes beyond legitimate investigative purposes.

Affirmed.

BLATZ, J., took no part in the consideration or decision of this case.

---

**8.** Prior to *Shephard,* sentencing manipulation was typically regarded as a form of sentencing entrapment. *See United States v. Calva,* 979 F.2d 119, 122–23 (8th Cir.1992).