**STATE of Minnesota, Respondent,**

v.

**Mark Anthony HEATH, Appellant.**

**No. A03–737.**

Court of Appeals of Minnesota.

Aug. 10, 2004.

---

50

Mike Hatch, Attorney General, Kobie Kasimu Hudson, Assistant Attorney General, St. Paul, MN, and Brett Allyn Corson, Preston, MN, for respondent.

John M. Stuart, State Public Defender, Steven P. Russett, Assistant Public Defender, Minneapolis, MN, for appellant.

Considered and decided by WILLIS, Presiding Judge; TOUSSAINT, Chief Judge; and LANSING, Judge.

## OPINION

TOUSSAINT, Chief Judge.

Appellant challenges his conviction of multiple counts of first-degree controlled-substance violations involving the sale and conspiracy to manufacture methamphetamine, making several arguments concerning the propriety and sufficiency of the evidence used to convict him, the possible exculpatory value of evidence destroyed by police after the methamphetamine lab raid, the court's conduct during trial, and the appropriateness of the sentence appellant received. Because (1) federal and state regulations required the destruction of the allegedly exculpatory evidence; (2) the evidence used to convict appellant was both proper and sufficient; and (3) the court's conduct during trial was proper under the circumstances, we affirm the conviction. But because the trial court erred in its sentencing determinations, we reverse and remand for resentencing.

## FACTS

Acting on a tip from a local resident, Rushford Police Chief Samuel Stensgard, Fillmore County Sheriff's Deputy John DeGeorge, and two other law enforcement officers legally entered a residential garage and found Broc Buytaert, Timothy Prigge, and appellant Mark Heath inside. It was clear to Deputy DeGeorge, a member of the Southeast Drug Task Force, that the garage was being used for a clandestine drug laboratory, as he recognized several items consistent with the manufacture of methamphetamine.

Deputy DeGeorge then contacted a clandestine lab team to come and search the garage. Rochester Police Sergeant Daniel Pulford, who is certified by the Drug Enforcement Administration to process methamphetamine laboratories, responded to Deputy DeGeorge's call and found numerous items in the garage consistent with the manufacture of methamphetamine. These items included solvents, tools, latex gloves, coffee filters, aluminum foil, packages of Sudafed, lithium batteries, rubber tubing, a blender, thermoses, and a fan. Sgt. Pulford also found a quantity of wet, white powder; a mirror; phone cards; and an electronic scale under the front of a vehicle inside the garage, where Heath was kneeling when the officers entered. Sgt. Pulford photographed the crime scene, and designated for destruction those items that he believed were contaminated.

After weighing and field-testing the wet, white powder found in the garage, along with amounts found during searches of Buytaert and Prigge, Deputy DeGeorge sent the powder to the BCA for testing. The BCA determined that the powder was, in fact, methamphetamine, and that its combined weight was 18.1 grams after it had dried—9.6 grams from under the vehicle, 3.3 from Buytaert's person, and 5.2 grams from Prigge's person.

Heath was charged with five counts of controlled-substance crime, including felony conspiracy to manufacture methamphetamine, in violation of Minn.Stat. §§ 152.196, subd. 1 and 152.021, subd. 2a (2002), and felony aiding and abetting the possession with intent to sell a mixture weighing ten or more grams containing methamphetamine, in violation of Minn. Stat. §§ 152.021, subd. 1(1) and 609.05 (2002). After a lengthy trial, a jury found Heath guilty on all five counts.

The trial court sentenced Heath concurrently for the counts of conspiracy to manufacture and aiding and abetting possession with intent to sell. Based on the court's findings of aggravating factors, Heath was sentenced to concurrent terms of 201 months and 237 months, both 50% upward durational departures. Heath now appeals.

## ISSUES

I. Were Heath's due-process rights violated by the state's failure to preserve the materials used to manufacture methamphetamine?

II. Did the state fail to prove that Heath intended to sell ten or more grams of a mixture containing methamphetamine?

III. Did the trial court err by excluding potentially exculpatory evidence?

IV. Did the trial court properly evaluate the credibility of *Spreigl* evidence before its admission at trial?

V. Did the trial court err in its cautionary instruction regarding other-crime evidence?

VI. Did the trial court err in sentencing Heath for both the conspiracy and the aiding-and-abetting counts as separate behavioral incidents?

VII. Did the trial court err in departing durationally from the sentencing guidelines?

## ANALYSIS

### I.

■ Heath first argues that "[b]ecause the police intentionally, and in bad faith, destroyed evidence that was potentially exculpatory," the trial court erred by not granting his motion to dismiss. In so erring, Heath argues, the court denied him his due-process rights under the Fourteenth Amendment to the United States Constitution.

■ When constitutional issues involving due process are raised, this court reviews the trial court's legal conclusions de novo. *State v. Biron,* 266 Minn. 272, 281, 123 N.W.2d 392, 398 (1963). A trial court's factual findings, however, are subject to a clearly erroneous standard of review. *State v. Critt,* 554 N.W.2d 93, 95 (Minn.App.1996), *review denied* (Minn. Nov. 20, 1996).

■ To establish reversible error, a defendant must establish that the destruction of evidence was intentional. *State v. Friend,* 493 N.W.2d 540, 545 (Minn.1992). The evidence must have had "an exculpatory value that was apparent before the evidence was destroyed." *State v. Edwards,* 380 N.W.2d 503, 509 (Minn.App. 1986) (citing *California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984)). When no more can be said of the evidence than it could have been subjected to tests, the results of which might have exonerated the defendant, the defendant must show bad faith on the part of the state to establish a due-process violation. *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). The defendant must also show that he would be unable to ob-

tain comparable evidence by other reasonably available means. *State v. Nelson*, 399 N.W.2d 629, 633 (Minn.App.1987), *review denied* (Minn. Apr. 17, 1987).

The United States Supreme Court's view that the defendant should be required to show bad faith is based on its "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause ... as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337. By placing the burden on the defendant to show bad faith, the state's obligation to preserve evidence is confined to cases where the "interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n. *, 109 S.Ct. at 336 n. *.

Here, Heath has failed to meet his burden of showing the officers acted in bad faith. He offered no proof that the police destroyed the evidence knowing it had exculpatory value. In fact, he has not even established that the evidence had *any* exculpatory value. Instead, he merely asserts that "it cannot be said with any degree of certainty that Heath was not prejudiced by the intentional and selective destruction of potentially exculpatory evidence." Such an assertion does not give rise to a violation of constitutional proportions.

Moreover, there is abundant testimony in the record showing the dangers of maintaining evidence that has been exposed to the methamphetamine manufacturing process. Sgt. Pulford testified that not only are many of the chemicals and ingredients inflammable and explosive, but also they emit toxic fumes that can cause liver and kidney disease. He also noted that some gases produced during the methamphetamine-manufacturing process are so poisonous that they can be deadly. Further, the byproducts of the manufacturing process are considered hazardous waste and are subject to substantial state and federal regulations. *See, e.g.*, Minn. Stat. § 221.033(200) (transporting hazardous waste) 40 C.F.R. §§ 261.3 (defining hazardous waste), 263.10.31 (transporting hazardous waste), 264.1–.1202 (regulating operators of hazardous waste disposal facilities) (2002).

Because the officers acted in accordance with state and federal regulations in destroying contaminated evidence, and there is no showing that the officers acted in bad faith, the trial court properly denied Heath's motion to dismiss.

## II.

Heath next contends that his conviction of first-degree possession with intent to sell methamphetamine must be reversed because the state failed to prove either that the wet mixture found under the car, which he contends must be dried in order to be sold, weighed more than ten grams when dried; or that the amounts distributed to his co-conspirators were either intended for sale or in Heath's "possession." He therefore asserts that the state has failed to prove he possessed the ten-gram threshold required for a first-degree conviction.

On a challenge to the sufficiency of the evidence, this court's review is limited to a "painstaking analysis of the

record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). A reviewing court must "assume that the jury believed the state's witnesses and disbelieved any contradictory evidence." *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the offense charged. *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988).

Here, the record provides sufficient factual basis to support the conviction. Officers testified, and photographs admitted into evidence show, that there were a number of evidentiary items that would allow a juror to infer that the co-conspirators were dividing the methamphetamine for sale: the methamphetamine found under the vehicle (weighing 9.6 grams after drying), packaging materials, a scale, and the presence of three separate cardboard bindles found on Prigge's person after his arrest (weighing 3.4 grams after drying). When "viewed in the light most favorable to conviction," this evidence clearly supports the finding of more than ten grams of methamphetamine.

Further, Heath cites no precedent to support his assertion that the jury must consider only the dry weight of the methamphetamine. When officers first confiscated the materials, the weight of the "wet" methamphetamine found under the vehicle was measured at 12.1 grams. Our statutes make no distinction between "wet" and "dry" methamphetamine, instead they simply forbid the sale of *"mixtures ... containing ... methamphetamine."* Minn.Stat. § 152.021, subd. 1(1)

(2002) (emphasis added). The jury could therefore find, simply from the amount of methamphetamine under the car, that Heath was aiding and abetting the illegal acts being performed.

### III.

 Heath also contends that the trial court committed reversible error by excluding defense testimony in two ways. First, Heath asserts that the trial court should have allowed testimony that Levi Storm, a defense witness, drove Heath to the garage the morning of Heath's arrest so that Heath could retrieve his jacket from a vehicle parked outside the garage. Second, Heath asserts that the trial court abused its discretion in preventing defense counsel from making this assertion during closing arguments. He contends that these rulings deprived him of his right to present an effective defense, and that therefore he should be granted a new trial.

 Absent an erroneous interpretation of the law, the question of whether to admit or exclude evidence is within the trial court's discretion. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45–46 (Minn.1997). "Entitlement to a new trial on the grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error." *Id.* at 46 (citation omitted). When dealing with a claim of erroneous exclusion of evidence, "prejudicial error" occurs when there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had been admitted. *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994).

Here, the trial court sustained the state's hearsay objection after Storm testified about his interaction with Heath the morning of the offense. Strom testified, "Umm, I was asleep and apparently he had walked from [a friend's] house to my

house and he asked if he could get a ride, he forgot his jacket." The court stated that the testimony was "clearly" hearsay and instructed the jury to disregard it. The court subsequently upheld the state's objection to similar responses from Storm on three additional occasions.

Though Heath asserts that Storm's testimony is *not* hearsay, it appears that this testimony is hearsay that falls within an exception as a statement of the declarant's intent, motive, or design at the time. Statements of the declarant's state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, or design are admissible even if the declarant is available. Minn. R. Evid. 803(3). This exception to the hearsay rule is based on the belief that such statements are sufficiently trustworthy to justify their admission into evidence. *Id.*, 1989 comm. cmt.

The statement that Heath wished to retrieve his jacket shows the reason for his desire to go to Hiser's residence. As such, it should have been admitted, and the trial court abused its discretion. The one occasion when the court sustained the state's objection to Heath's closing argument likely compounded this error.

▆ But even if the trial court abused its discretion, we are not convinced that this error was prejudicial. Storm *did* testify that Heath needed a ride the morning of the offense, and that Storm offered to give him one. And, contrary to Heath's assertions now, his counsel did successfully assert during his closing argument, without objection, that Heath was merely retrieving his jacket.

In short, Heath's alibi *was* presented to the jury and, notwithstanding this assertion, the jury found Heath guilty. We therefore find the court's error in excluding Storm's testimony to be harmless.

## IV.

▆ Heath next asserts that the trial court improperly admitted testimony from Heath's ex-girlfriend (and convicted felon), Machelle Weege, who testified that Heath knew how to manufacture methamphetamine and had done so in the past.

▆ The admission of evidence of other crimes or bad acts under Minn. R. Evid. 404(b)—commonly known as *Spreigl* evidence—lies within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *State v. Spaeth*, 552 N.W.2d 187, 193 (Minn.1996). There are, however, established requirements before *Spreigl* evidence may be admitted: (1) the trial court must determine whether proper notice was given; (2) the state must clearly indicate what the evidence will be offered for; (3) the evidence must be clear and convincing that the defendant participated in the *Spreigl* evidence; (4) the evidence must be relevant and material to the state's case; and (5) the probative value cannot be outweighed by the potential for prejudice. *State v. Asfeld*, 662 N.W.2d 534, 542 (Minn.2003). Heath concedes that the first two requirements were met, but contends that the trial court abused its discretion in determining that Weege's testimony adequately satisfied the remaining three.

### A. Clear and Convincing

Heath focuses on a limited portion of the trial transcript in an effort to prove that the trial court completely failed to consider witness credibility, erroneously concluded that the evidence was clear and convincing, and improperly deferred all such credibility determinations to the jury. In so erring, he asserts, the court failed in its essential function as an evidentiary gatekeeper. The record read in its entirety, however, reflects that Heath's arguments are inaccurate.

While the jury ultimately weighs the credibility of a witness who testifies at trial, "it is the function of the trial court to weigh the credibility of a witness" when determining at the *Spreigl* hearing whether allegations of misconduct are supported by clear and convincing evidence. *State v. Doughman,* 384 N.W.2d 450, 455 (Minn.1986). A finding of clear and convincing evidence can be based on the uncorroborated testimony of a single witness. *State v. Kennedy,* 585 N.W.2d 385, 389–90 (Minn.1998). A witness's felony convictions do not, as a matter of law, render her testimony unworthy of belief. *See State v. Pippitt,* 645 N.W.2d 87, 94 (Minn.2002).

Here, Heath points to the following portion of the transcript as supporting his assertion that the trial court abused its discretion:

> The issue of credibility, there was disagreement on that. It is the Court's clear opinion after review of the evidence that the Court doesn't make a credibility determination of a witness, that is for the fact finder to make, and it is in fact for the jury to make. Case law supports that and essentially makes that the jury's exclusive prerogative.

This quote, however, is taken out of context. Though the trial court did make this statement, it later clarified its stance and noted that, as part of its "clear and convincing" determination, it clearly had the right to limit testimony that no reasonable trier of fact could believe. And after the court listened to Weege's testimony in a *Spreigl* hearing, it determined "that her testimony could in fact be believed by a reasonable person." Thus, despite Heath's assertions to the contrary, Weege's credibility was fully considered by the court, and we shall not disturb the trial court's determinations about the admissibility of such evidence.

## B. Relevant and Material

Heath next contends that Weege's testimony was not relevant, stating that the state's main reason for introducing the evidence was to show past joint criminal activity. He asserts, therefore, that the evidence was "merely a subterfuge for impugning Heath's character and suggesting he was acting in conformity with that character."

Notwithstanding these assertions, the evidence was clearly introduced to show Heath's knowledge of methamphetamine manufacture, intent, common scheme, and to rebut Heath's defense that he was an unfortunate victim of circumstance. For such reasons, the evidence was clearly admissible. *See* Minn. R. Evid. 404(b).

## C. Probative Value v. Prejudicial Impact

Heath also asserts that the prejudicial impact of Weege's testimony outweighs any probative value the evidence may have. He argues that an examination of the state's closing argument reveals that the evidence was introduced solely to attack his character. He argues that the evidence, therefore, was unfairly prejudicial.

To support his assertions, Heath points to the following portion of the state's closing argument:

> [W]e know the defendant knows how to manufacture methamphetamine. His ex-girlfriend told us that. So is he the kind of person who knows how to manufacture at a methamphetamine lab? What are the chances that that person is involved? Pretty good.

Heath urges this court to consider this as a call to the jury to consider Weege's testimony as propensity evidence. But the quote, taken in context, suggests that the state was merely attempting to establish

that Heath had knowledge of methamphetamine manufacturing and that, where one of the involved parties was knowledgeable about manufacturing techniques, that party's presence infers a common scheme or purpose. Reversal based on these grounds is unwarranted.

## V.

 Heath additionally contends that the trial court erred in refusing to instruct the jury on the specific purposes for which the *Spreigl* evidence was admitted. Heath argues that by failing to make such modifications to the jury instructions, the court failed to ensure that the jury would properly use the evidence and "not misuse the evidence as propensity evidence."

 Trial courts are allowed considerable latitude in selecting the language of jury instructions. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986). We will not reverse a trial court's decision unless the instructions constituted an abuse of discretion. *See id.* (concluding that appellant failed to demonstrate trial court's instructions were an abuse of discretion).

In *State v. DeYoung*, 672 N.W.2d 208 (Minn.App.2003), this court determined that "when a defendant requests a limiting instruction, the district court must give such an instruction." *Id.* at 212. We determined, however, that the error in *DeYoung* was harmless because (1) the trial court instructed the jury that the *Spreigl* evidence could only be considered for the limited purpose of determining whether appellant committed the charged offense, and that he could not be convicted based on the previous occurrences; (2) during closing arguments, the defense attorney and the prosecutor both explained that the *Spreigl* evidence could only be used to establish motive and identity; and (3) the record was replete with evidence against the appellant. *Id.* at 212–13.

Similarly here, the trial court refused to modify the language of the jury instructions after Heath requested they be altered to reflect that the *Spreigl* evidence was being introduced solely to show knowledge. The trial court determined that such an instruction was erroneous, because the evidence could also be used for "showing more than mere knowledge." But instead of expanding the scope of the requested modification, the trial court left the language out completely, and relied on *Minnesota Practice Jury Instruction Guide* CRIMJIG 2.01, a general cautionary instruction.

Like *DeYoung*, we find the error here harmless because the trial court offered a blanket cautionary instruction that warned jurors not to convict Heath for the crimes he may have committed in the past, defense counsel urged the jury not to consider Heath's prior acts as proof of his guilt for the present offense, and the record reflects a strong case against Heath. The record shows that immediately upon their entry into the garage, officers observed that Heath slid a large amount of methamphetamine under the vehicle in the garage. The methamphetamine was still wet, and the bottle used to produce it still gaseous, both indications that the manufacturing process had just been completed. The position of Heath in relation to the two other defendants, as well as the evidence in the immediate area, suggests that he was dividing and distributing the methamphetamine, rather than having just arrived to make a purchase, as he suggests. In light of these facts, it is therefore clear that the trial court's error did not have a significant impact on the verdict.

## VI.

 Heath next argues that the trial court erred by determining that the two crimes for which he was sentenced were

separate behavioral incidents. He contends that "the conspiracy and manufacturing offenses were merely the means" to sell the methamphetamine found in the garage. A review of the record, however, justifies the trial court's determinations.

 The trial court may impose only one sentence if a person's conduct constitutes more than one offense but is part of the same behavioral incident. *See* Minn.Stat. § 609.035, subd. 1 (2002). If multiple sentencing is barred under the statute, even concurrent sentencing is barred. *State v. O'Hagan*, 474 N.W.2d 613, 622 (Minn.App.1991), *review denied* (Minn. Sept. 25, 1991). The statute is intended "to protect against exaggerating the criminality of a person's conduct and to make both punishment and prosecution commensurate with culpability." *State v. Secrest*, 437 N.W.2d 683, 684 (Minn.App. 1989) (quoting *State v. Eaton*, 292 N.W.2d 260, 266 (Minn.1980)) (other citation omitted), *review denied* (Minn. May 24, 1989).

 Whether offenses arose out of the same behavioral incident depends on the facts and circumstances of the particular case. *State v. Bookwalter*, 541 N.W.2d 290, 294 (Minn.1995). The trial court, in making that determination, looks at the factors of time and place and whether the conduct was motivated by a single criminal objective. *Id.* Courts must also consider whether the offenses (1) arose from a continuous and uninterrupted course of conduct; (2) occurred at substantially the same time and place; and (3) manifested an indivisible state of mind. *See id.* at 294–97; *see also State v. Soto*, 562 N.W.2d 299, 304 (Minn.1997). The court's decision is a fact determination that is not reversed on appeal unless clearly erroneous. *Effinger v. State*, 380 N.W.2d 483, 489 (Minn. 1986). A factual determination is clearly erroneous if it is unsupported by the record. *See State v. Wasson*, 615 N.W.2d 316, 322 (Minn.2000).

Here, the record supports the trial court's determination that conspiracy to manufacture and possession with intent to sell were not a single behavioral incident. A witness stated that Buytaert was seen with a "cooker" used to manufacture methamphetamine early that morning. Sgt. Pulford testified that he found numerous items used to manufacture methamphetamine, including solvents, tools, latex gloves, packages of Sudafed, and lithium batteries. The conspiracy was therefore committed when Buytaert, Prigge, and Heath *agreed* to manufacture the drug, and when they took their first *overt act* in furtherance thereof. *See State v. Tracy*, 667 N.W.2d 141, 146 (Minn.App.2003) (stating that conspiracy does not require proof of underlying crime). Thus, by the time the three purchased, borrowed, or brought this material to the garage, the conspiracy had already occurred. This "behavioral incident" therefore took place *before* the second behavioral incident in which methamphetamine was in their possession and was divided. The two offenses are therefore divisible.

 Although the acts may have been part of a single plan to make a profit, "the criminal plan of obtaining as much money as possible" does not constitute a single criminal objective. *Soto*, 562 N.W.2d at 304. We therefore affirm the trial court's imposition of concurrent sentences for conspiracy and aiding and abetting.

## VII.

 Heath's final argument is that the trial court erred in imposing a 50% upward durational departure for both sentences. He asserts, and the record reflects, that the court departed for a "multiplicity" of reasons, but it would not have departed if only one of those aggravating factors exist-

ed. Heath now contends that a majority of the allegedly aggravating factors are invalid because they duplicate the elements of the crime of which he was convicted. He further asserts that the trial court erred by failing to consider the two offenses separately in order to identify what departure factors apply to each offense.

 The decision to depart from the sentencing guidelines rests within the trial court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Givens*, 544 N.W.2d 774, 776 (Minn.1996). When a court does make such a departure, "it must articulate substantial and compelling reasons" justifying its action. *State v. Schmit*, 601 N.W.2d 896, 898 (Minn.1999). Generally, in determining whether to depart durationally in sentencing, a court must decide "whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Broten*, 343 N.W.2d 38, 41 (Minn.1984).

### A. Aggravating Factors

In *State v. McIntosh*, the Minnesota Supreme Court expressed its concerns about the aggravating factors listed for major controlled-substance crimes in the Minnesota Sentencing Guidelines. 641 N.W.2d 3, 11 (Minn.2002). It noted that these factors were established *before* drug offenses were based on the quantity of the substance in the charged offense. *Id.* It thereafter cautioned courts against using aggravating factors that "were considered by the legislature in determining the severity of the offense," for doing so would duplicate an element of the offense. *Id.* at 11–12 (quoting *State v. Peterson*, 329 N.W.2d 58, 60 (Minn.1983)).

Here, the trial court's sentencing report lists five reasons for its upward durational departure. First, children (ages 5 months and 19 months respectively) were present on the property and could be exposed to the potentially lethal chemicals. Second, the amount of the drug was "substantially larger than for personal use." Third, the defendant manufactured for other parties. Fourth, Heath "occupied a high position within the drug distribution hierarchy and the offense involved sophistication and planning." Fifth, Heath committed this act as part of a group of three or more individuals who were actively involved in the crime. Though Heath contests *all* the aggravating factors against him, he asserts that the majority of them cannot be justified because they duplicate elements of the crimes for which he was convicted.

### Major Controlled–Substance Violation

The trial court determined that Heath's offenses warranted departure from the guidelines because they were major controlled-substance offenses. It based its determination on the amount of the substance being greater than for personal use; the methamphetamine being intended for other parties outside the conspiracy; Heath's high position within the hierarchy; and the sophistication of the operation. Heath concedes that all these aggravating factors are listed expressly in the sentencing guidelines. Minn. Sent. Guidelines II. D.2.b.(5). He asserts, however, that in light of *McIntosh*, even aggravating factors listed in the sentencing guidelines cannot justify an upward durational departure if those factors are elements of the offense.

With respect to the trial court's first two factors (the amount of and intended use for the methamphetamine), we agree with Heath that those factors are elements of the possession offense and cannot be used as justification for an upward durational departure. To be convicted of first-degree possession with intent to sell, a defendant

must (1) be in possession of ten or more grams of methamphetamine, a substantial amount that is often greater than for personal use and (2) have intent to "sell," which is statutorily defined as selling, giving away, bartering, delivering, exchanging, distributing, or disposing of *to another*. Minn.Stat. §§ 152.01, subd. 15a; 152.021, subd. 1(1). And because these are essential elements of first-degree controlled-substance-sale crimes, the trial court *could not* consider these factors as aggravating the severity of the crime. *McIntosh*, 641 N.W.2d at 11–12.[1]

■ Furthermore, while "sophisticated planning" is an aggravating factor, the record *does not support* the trial court's finding that the clandestine laboratory here was sophisticated. In fact, Sgt. Pulford testified that the laboratory was quite common. The state asserts that a lab can be both common *and* sophisticated, pointing to "all of the ingredients involved in amateur methamphetamine manufacture," but if the state were to succeed in this argument, it would justify upward durational departures for *all* methamphetamine-manufacture convictions, because there is no known manufacturing process that is less sophisticated than the one at issue here.

■ With respect to the final aggravating factor for a major controlled-substance offense, Heath argues that the record fails to support the trial court's findings regarding his "high position." To the contrary, Weege's testimony indicated that Heath had training in chemistry, prior experience in manufacturing methamphetamine, and had instructed others on manufacturing the drug. This testimony thus supports the trial court's

finding that Heath's "experience and finesse" put him into a "high position" in this particular drug conspiracy.

But even if the court properly found that Heath was in a "high position," section II.D.2.b.(5) of the Minnesota Sentencing Guidelines requires that the trial court must find *two or more* of its listed aggravating factors to depart from the presumptive sentence for "major controlled substance offenses." Because two of the trial court's listed factors were elements of one of the crimes for which he was convicted, and because the evidence does not support the trial court's finding of "sophisticated planning," the trial court erred in using "major controlled substance offenses" to justify its upward durational departure for aiding and abetting the possession with intent to sell.

Three or More Persons

■ Heath also urges this court to find that the trial court erred in departing on the ground that three individuals were actively involved in the crime. Though the involvement of three or more persons in the commission of the crime is listed as an aggravating factor in the sentencing guidelines, Minn. Sent. Guidelines II.D. 2.b. (10), we agree that applying this factor was inappropriate under the circumstances. The trial court made the following observation:

> Clearly the only requirements of the conspiracy statute are that there be at least two persons. Here there are three. I don't know exactly why the Minnesota Guidelines Commission determined that it can be or is an aggravating departure if there are three or more

---

1. The state attempts to circumvent this argument by stating that Heath was convicted not for *selling* methamphetamine, but rather for *the possession with intent to sell* methamphet-amine and/or *aiding and abetting* such an act. But possession with intent to sell, for statutory purposes, is part of the definition of "sell." Minn.Stat. § 152.01, subd. 15a (2002).

persons who actively participate in a crime but they did so.

It appears from the record, then, that the trial court applied this aggravating factor without clearly providing justification for doing so. There is no basis in the record to support a conclusion that a three-member conspiracy here was substantially different from a two-member conspiracy under the same circumstances. Because the trial court failed to provide an adequate, "substantial and compelling" basis for this factor, we find that the trial court abused its discretion in making this determination.

Presence of Children

■ Heath also contends that the presence of children should not have been used as an aggravating factor. His assertion that the children were not present simply because they were not in the garage with the co-conspirators is unmeritorious; his overall argument that the court erred in considering the presence of the children, however, is persuasive.

■ Though the presence of children is not explicitly listed as an aggravating factor in the sentencing guidelines, section II.D.2 explicitly states that it is "a nonexclusive list of factors which may be used for reasons of departure." In the context of violent crime, the presence of children has justified an upward departure. *State v. Hart*, 477 N.W.2d 732, 740 (Minn.App. 1991), *review denied* (Minn. Jan. 16, 1992); *State v. Dalsen*, 444 N.W.2d 582, 584 (Minn.App.1989), *review denied* (Minn. Oct. 13, 1989).

Here, however, the presence of children is an improper aggravating factor of the crimes for which Heath was sentenced. Though the trial court correctly notes the inherent risk of the children's belongings being exposed to the potentially lethal chemicals involved in manufacturing meth-

amphetamine, not to mention the possibility of a toddler having access to such chemicals, Heath was not sentenced for the *manufacture* of the drug. Rather, he was sentenced for the *conspiracy* to manufacture the drug, a crime that took place some time before the manufacture took place, and the *possession* of the drug, which took place after the drug's manufacture. Therefore, consideration of the children's presence during the manufacturing process was error.

### B. Separating Offenses

■ The trial court's failure to distinguish the justifications for an upward durational departure between the offenses is problematic as well. In *State v. Williams*, the Minnesota Supreme Court noted its concern when the trial court relied on 15 aggravating factors to justify, in the aggregate, upward departures on three sentences. 608 N.W.2d 837, 840 (Minn.2000). It noted that the "separate analysis of the reasons for departure as to each sentence may have led to a different sentencing result, would have informed the appellant as to the rationale for each sentence, and of course would have provided a clear record for review." *Id.* at 841. It further noted that the factors supporting departure on one sentence may not justify departure on another. *Id.*

Here, the sentencing order separately listed the two offenses of which Heath was convicted. For both offenses, however, the trial court refers to *all* of the aggravating factors from its sentencing departure report as justification for its upward durational departure. In light of *Williams*, we must conclude that the trial court erred in failing to separate its justifications for departure.

In general, this court must adhere to the rules for evaluating guideline departures established in *Williams v. State*, 361

N.W.2d 840, 844 (Minn.1985), and if the reasons given for departure are improper or inadequate, this court must examine the record to determine whether there is sufficient evidence to affirm the district court's departure. The record here reflects that the only possible justifiable departure would be the major controlled-substance violation of conspiracy to manufacture methamphetamine. But because the trial court here appeared reluctant to depart based solely on a single aggravated factor, and because the trial court erred in failing to separate its justifications for departure, we remand to the district court to make these sentencing determinations.

We note in conclusion that after the parties submitted their initial briefs, the United States Supreme Court filed *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In *Blakely,* the Supreme Court determined that by allowing judicially-found facts to enhance a sentence beyond the maximum sentence prescribed by the Washington sentencing guidelines, the Washington sentencing procedures deprived a defendant of the federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to sentencing. *Id.* at 2537. Because this case, like *Blakely,* involves judicially-found facts enhancing Heath's sentence beyond that which is recommended in the guidelines, we instruct the district court, upon remand, to consider the applicability of *Blakely* to the sentence.

## DECISION

Because (1) federal and state regulations required the destruction of the allegedly exculpatory evidence, and there is no evidence of bad-faith spoliation; (2) the evidence in the record sufficiently supports the convictions; and (3) the court's conduct during trial was proper, we affirm the convictions. But because the trial court erred in its analysis of aggravating factors justifying upward durational departures, we reverse and remand for resentencing.

**Affirmed in part, reversed in part, and remanded.**